# UNITED STATES DISTRICT COURT
## FOR THE
## SOUTHERN DISTRICT OF ILLINOIS

AMY SWYEAR                                    )
                                             )
                     Plaintiff,              )
                                             )        Case No.  16-1214
v.                                           )
                                             )        JURY TRIAL DEMANDED
FARE FOODS CORPORATION                       )
                                             )
                     Defendant.              )
                                             )

## COMPLAINT

Plaintiff Amy Swyear, by and through counsel Kaufhold and Associates P.C., brings this suit against Defendant Fare Foods Corporation, and alleges and states as follows:

### PRELIMINARY STATEMENT

1. Plaintiff Amy Swyear brings individual claims against Defendant Fare Foods Corporation for Sexual Discrimination, Sexual Harassment, and Retaliation for opposing Sexual Harassment under the Civil Rights Act, 42 U.S.C 2000e et sep. ("Title VII").

2. Plaintiff brings individual claims against Defendant for retaliatory discharge under Illinois Common Law.

3. Prior to the institution of this lawsuit, Plaintiff filed a charge with the U.S. Equal Employment Opportunity Commission against Defendant.  Plaintiff received a "Right to Sue" Notice on August 10, 2016.  See attached as Exhibit A. This lawsuit commenced within ninety (90) days thereafter, and all conditions precedent to the institution of this lawsuit have been performed or have occurred.

PARTIES

4.  Plaintiff Amy Swyear is a natural person who was employed by Defendant within the meaning of the statutes pursuant to which the below mentioned claims are brought.

5.  Defendant Fare Foods Corporation is a body corporate incorporated in Illinois. Defendant is headquartered at 208 Cherry Lake Road, Du Quoin, Illinois 62832. Defendant employs more than fifteen (15) people.

JURISDICTION AND VENUE

6.  The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 because the Plaintiff's claims under 42 U.S.C. § 2000e arise under federal law.

7.  This Court has supplemental jurisdiction over the causes of action of Plaintiff pursuant to 28 U.S.C. § 1367 because these claims are so related to the federal claims that they form part of the same case or controversy.

8.  This Court has jurisdiction to issue a declaratory judgment for the foregoing violations pursuant to 28 U.S.C. §§ 2201 and 2202.

9.  Venue is proper in this District under 28 U.S.C. § 1391(b) because the Defendant operates and maintain their headquarters and a warehouse facility with its principle place of operation being located within the District and because a substantial part of the events giving rise to the claims occurred within the Southern District of Illinois, as more fully described below.

FACTUAL ALLEGATIONS

10. Plaintiff is a female who resides in New Athens, Illinois.

11. Defendant extended a written offer of employment to Plaintiff on June 18, 2015.  The offer included terms negotiated by the parties after previous contract offers.

12. During one negotiation, Defendant's owner and principal, Ron Porter ("Porter"), verbally informed Plaintiff that she was the first women he hired as an outside sales representative.  Porter stated he had yet to hire a woman for an outside sales representative job due to a personal fear of how they would behave while on company travel.  Porter communicated to Plaintiff that women could not control their sexual desires while on the road.  Therefore, Porter did not hire women for traveling positions.

13. In order to quail his concerns, Porter questioned Plaintiff's abilities to "conduct" herself to Plaintiff's mother.  Upon Plaintiff's mother's affirmation that Plaintiff could handle herself professionally, Porter decided to hire Plaintiff due to her vast industry experience.

14. Plaintiff was insulted and humiliated as a result of Porter's comment.  Furthermore, Plaintiff felt disgusted and embarrassed by Porter's unprofessionally approach to Plaintiff's mother regarding Plaintiff's sexual behavior.

15. Reluctantly, the Plaintiff accepted the terms of the June 23, 2015; her first day of employment.  Thereby, an employment contract formed between the parties.  The employment contract ("Contract") is attached Exhibit B and is incorporated by reference.

16. The Contract did not have a fixed duration and could be terminated by either party, at any time, for any reason.  (Ex. B, p. 2 ¶ 10)

17. Upon starting, Defendant did not provide Plaintiff with an employee handbook and/or policies outlining the company's harassment policy.

18. Pursuant to the terms of the agreement, Defendant employed Plaintiff as an Outdoor Sales Representative.  (Ex. B, p. 1 ¶ 1)

19. As an Outdoor Sales Representative, Plaintiff's primary duties included interacting with current and potential customers at fairs and conventions located throughout the Midwest.

(Ex. B, p. 1, cl. 8, 11).  Additionally, Plaintiff's duties include processing sales orders.

(Ex. B, p. 1, cl. 1)

20. Ancillary to her sales duties, the Contract requested Plaintiff to assist delivery drivers

with deliveries.  (Ex. B, p. 1, cl. 1).  It did not task Plaintiff with completing deliveries.

21. In order to assist her in the completion of her duties, Defendant agreed to provide

Plaintiff with: 1) cell phone or reimbursement if Plaintiff used her personal phone, 2)

company credit card, 3) company gas card, 4) corporate lodging card.  (Ex. B, p. 2 ¶ 4).

Defendant also agreed to provide Plaintiff with a company vehicle.  (*Id.*).

22. Upon beginning her employment, the terms of her job quickly changed.

23. Defendant refused to provide Plaintiff with a company credit card to pay for expenses

incurred while out on the road.  Rather Defendant informed Plaintiff that credit card were

not given to new outside sales representatives for eight (8) weeks.  It took repeated

requests by Plaintiff to fulfill the terms of the Contract by providing a company credit

card for Defendant to provide a credit card as promised.  However, upon information and

belief, Defendant provided a recently-hired, male outside sales representative with a

credit card within a short period of time without facing similar hurdles.

24. By not providing Plaintiff with a company credit card as agreed, Defendant forced

Plaintiff to pay for business expenses using personal funds.

25. Defendant, then, forced Plaintiff to seek reimbursement for these expenses.

26. When Plaintiff questioned why she had yet to receive a credit card as contractually

promised, Defendant, via its office manager, claimed it violated standard operating

procedure to provide credit cards to employees during the first eight weeks as most new

employees do not stick around.

27. Plaintiff questioned Defendant's response given she received a company gas card almost immediately.

28. Additionally, for the first two remote dispatches upon which Defendant sent Plaintiff, Plaintiff served as a delivery driver.  Plaintiff delivered sales items to the customers of male outside sales representatives.

29. While on these deliveries, Plaintiff made multiple stops on her own accord attempting to make sales contacts as Defendant hired her to do.

30. However, upon returning to the home office, Porter and Robbie Williams ("Williams"), Defendant's then-Sales Manager and Plaintiff's then-direct supervisor scolded her for making sales visits while on the delivery run.

31. During the week of July 13, 2015, Porter sent Plaintiff on a multiple-stop delivery/sales trip in Northern Illinois and Eastern Iowa.

32. While making a brief stop in East Moline, Illinois at the local fair, Plaintiff received a call from another Outside Sales Representative, Russ Scott ("Scott"), who she had never met. Scott informed Plaintiff that he was nearby and wanted to introduce Plaintiff to a few people.

33. After meeting a few people alongside Scott, Plaintiff texted Williams requesting to leave Scott and continue to the next stop on her route.  Williams ordered her to "stay and hang" with Scott.

34. While introducing Plaintiff to one client, Scott informed the client that Scott and Plaintiff were "going back to get a room;" implying to the client that the two intended to stay together that night.  Plaintiff felt insulted, humiliated, and embarrassed by Scott's comments.

35. Plaintiff quickly informed the client that Scott and Plaintiff were not getting a room together and that it was a miscommunication.

36. Upon returning to the parking lot of the fairgrounds, Scott began looking up overnight corporate lodging availability. While doing so, Scott began brushing up against Plaintiff acting as if he were attempting to read her phone screen. Again, Plaintiff felt uncomfortable and humiliated by Scott's advances.

37. Scott decided that Plaintiff and Scott would stay at The Lodge Hotel in Bentonville, IA. Scott instructed Plaintiff to follow him there.

38. Upon entering her vehicle, Plaintiff texted her supervisor Williams, again, requesting to go to her next scheduled location arguing that the selected hotel was out of her way. Williams instructed her not to proceed to her next scheduled stop and, rather, to stay along with Scott.

39. Upon arriving to the Lodge Hotel, Scott checked Plaintiff and Scott into neighboring rooms.

40. When the two went to their rooms, Scott invited Plaintiff into his room. When Plaintiff did not take the invitation, Scott followed Plaintiff into her room. Scott claimed to be inspecting the air conditioner, as it was so warm in Plaintiff's room.

41. Feeling uncomfortable, Plaintiff entered the hallway hoping to entice Scott into leaving her room. Scott obliged when Plaintiff ushered the two to the hotel restaurant for dinner.

42. While in the elevator, Scott began rubbing Plaintiff's back. Plaintiff felt uncomfortable and embarrassed by the unwanted physical gesture.

43. Additionally, Scott attempted to guide Plaintiff to a secluded portion of the hotel when the elevator "mistakenly" stopped in the hotel's basement.  Plaintiff became frightened by Scott's behavior.

44. During dinner, Scott became intoxicated; consuming three alcoholic beverages.  Scott began slurring his speech and stumbling while walking.

45. While walking back from dinner, Scott propositioned Plaintiff to take a swim in hotel's pool.  When Plaintiff informed Scott that she did not bring a swimsuit with her, Scott stated "well, that's no problem" and laughed.

46. Plaintiff felt uncomfortable and embarrassed by the remark.  Plaintiff left the area quickly.

47. A short time later, after Plaintiff returned from grabbing her belongings from her work vehicle, Scott followed Plaintiff into her room and crawled into Plaintiff's bed.

48. Scott pushed up against Plaintiff as she began to open her IPAD.  Plaintiff quickly closed the IPAD and stated she was tired.

49. As Scott exited the room, Scott stated "well, if you decide to watch a movie, I will be your cuddle buddy.  I love to cuddle."

50. Scott did not make it into his adjacent room without soliciting Plaintiff to check his air conditioner to see if it was working properly.  Plaintiff, finding nothing obviously wrong, stated it may take a while for it to cool the room down.

51. Scott responded by commenting how the beds did not have heavy blankets on them. Scott then propositioned Plaintiff to spend the night with him again by stating "What we ought to do is get the blanket from all four (4) beds and just sleep in one (1) together to stay warm.

52. As a result of Scott's comments, Plaintiff felt humiliated, embarrassed, insulted, uncomfortable, and frightened.  Plaintiff immediately returned to her room where she locked the door after entering.

53. Upon entering her room, Plaintiff took a shower.  While in the shower, Scott called Plaintiff's phone.  When Plaintiff did not answer, Scott began knocking at the door. Plaintiff, feeling frightened, did not open the door.  In fact, Plaintiff left the water running in the shower in hopes Scott would hear it and go back to his room.  Scott continued to take turns knocking on door with each turn getting more aggressive.

54. Plaintiff turned off the shower after letting it run for an hour.  Plaintiff texted Scott to inform him she was in the shower.  Scott waited about ten minutes or so before returning to Plaintiff's door in hopes of gaining entry again.  Again, Plaintiff ignored his knock.

55. Plaintiff verbally reported the unwanted sexual advances to Defendant's Administrative Supervisor Scott Harsy ("Harsy") during the following week on or about July 23, 2015. Harsy took written notes of conversation while communicating to Plaintiff how shocked he was by Scott's behavior; at one point stating "oh god, that Russ."

56. Plaintiff requested that Defendant's management keep this incident in mind when planning future business travel.

57. On or about August 3, 2015, Harsy called Plaintiff into his office.  Upon entering, Harsy requested that Plaintiff make a written statement regarding her allegations against Scott. Harsy told Plaintiff to "get it to me today."  Immediately following his request, Harsy got into a car with Williams, in which, upon information and belief, they traveled to Champaign, Illinois.

58. Plaintiff did not feel comfortable writing her statement while at work due to the close proximity with her coworkers.  Upon Harsy's return from the trip, Plaintiff informed him she would work on the complaint that evening.  Harsy told her it was ok if she emailed the complaint to him that evening.

59. That evening, Plaintiff developed an eye infection induced by the extreme stress of reliving the events that occurred with Scott.

60. The next morning, Plaintiff notified Williams that she needed to work from home due to the eye infection.  Williams responded later that afternoon requesting an update on her eye.  Plaintiff informed him that it got worse and she was going to the emergency room to seek treatment.

61. The next day, Plaintiff sought treatment from an eye specialist.  Due to a scheduled follow up appointment with the eye specialist, she, again, notified Williams she needed to work remotely.  Williams failed to respond.

62. Williams left a message on Plaintiff's phone the following morning to call into the office. Upon returning the call, Williams terminated Plaintiff's employment with Defendant.

63. Prior to Plaintiff's termination but after Plaintiff reported the harassment, Plaintiff's work environment drastically soured; thereby creating an intimidating and hostile work environment.

64. For instance, Defendant effectively reassigned Plaintiff to an Inside Sales Position along with the other "sales women".  After reporting the harassment, Defendant actively prevented Plaintiff from making outside sales visits to clients and potential clients.  This was directly contradictory to her male counterparts as they operated from the road on a majority basis.

65. While limiting Plaintiff to the office, Defendant refused to return Plaintiff's company vehicle following the completion of scheduled maintenance.

66. By doing so, Defendant forced Plaintiff to use her personal vehicle to make local visits to clients and potential clients.  Furthermore, Defendant refused to send Plaintiff on any overnight travel.

67. While Defendant reimbursed Plaintiff due to her usage making company calls, Defendant's management openly berated Plaintiff for using her personal phone during work hours in the office.  Defendant disregarded the fact Plaintiff had been using her personal phone to make sales calls since her date of hire.

68. A derogatory and hostile environment is nothing new to Defendant's corporate offices.

69. In addition to the hostile treatment directed at Plaintiff following her incident report, Plaintiff witnessed numerous instances of derogatory treatment towards women.

70. For instance, employees, including senior management such as Porter and Williams, routinely used derogatory nicknames for employees and clients.  It was common practice for employees to refer to one female client as "Cunty."  Defendant justified the practice by reasoning that the woman was unpleasant and it was similar to her actual name.

71. Employees stereotyped a second female client by referring to her as a "typical big tittie blonde carny."

72. Additionally, it was common practice to refer to female clients as "bitches."

73. Furthermore, female employees faced constant ridicule for their office attire.  Male employees chastised female employees if the females exited the refrigerator and the female's erect nipples could be seen through her wardrobe.

74. Management routinely scolded female employees for wearing clothing that sexual "excited" male employees.

75. Defendant fostered an environment which elevated male employees based upon their sexual conquests.  This included the sexual conquest of female employees by male employees.

76. The Defendant maintained temporary living quarters at its corporate headquarters. Defendant and its employees referred to the living quarters as the "Party Barn." Defendant threw company parties in the Party Barn.

77. Male employees were encouraged to entertain female clients in the Party Barn. Employees openly discussed the sexual exploits of male employees in the Party Barn alongside company managers including Porter and Williams.

78. By participating in this derogatory treatment towards women and bolstering the status of male employees based upon their sexual exploits, Defendant fostered a hostile and intimidating environment towards women.  Male employees were not subjected to the same harassment.

79. Defendant did not take remedial measures to prevent similar conduct from occurring in the future.

## COUNT I:  SEXUAL DISCRIMINATION UNDER TITLE VII

80. Plaintiff realleges the above stated paragraphs of this Complaint as if stated herein.

81. Title VII prohibits employment discrimination based on race, color, religion, sex, and national origin.  Title VII also prohibits an employer from retaliating against an employee who opposes gender discrimination in the workplace.  42 U.S.C. § 2000e et seq.

82. Defendant is a person within the meaning of 42 U.S.C. § 2000e(a) and an employer within the meaning of 42 U.S.C. § 2000e(b).

83. Plaintiff is an employee within the meaning of 42 U.S.C. § 2000e(f).

84. The Defendant discriminated against Plaintiff by subjecting her to disparate treatment and unequal terms of employment on the basis of her gender in violation of Title VII, 42 U.S.C. 2000e-2 by (1) subjecting Plaintiff to a hostile work environment by openly berating Plaintiff extensively while not subjecting male employees to similar treatment; (2) subjecting Plaintiff and other women to verbal harassment by calling them by derogatory terms, including but not limited to "Cunty", "Bitches", and "Big Tittie Blonde," based upon their gender; (3) scolding Plaintiff and other women for provoking the discriminatory behavior, (4) subjecting Plaintiff and other women to unequal hiring standards based upon their gender; (5) failing to timely provide Plaintiff with equal terms of employment by not providing her with the tools, including but not limited to, company credit card, and company vehicle, necessary to complete her job while providing these tools to male employees in similar positions; (6) preventing Plaintiff from performing her job functions, including but not limited to: restricting Plaintiff from overnight travel, restricting Plaintiff's interactions with clients and potential clients, reassigning Plaintiff to Inside Sales position, terminating Plaintiff under false pretenses, (7) subjecting Plaintiff to remedial training for deficiencies while not requiring similar treatment of younger males while similar performance, (8) requiring Plaintiff to use personal funds for business expenses while not requiring the same from male employees.

85. The Defendant did not have adequate policies or procedures in place to address sexual discrimination, nor did it implement prompt remedial measures when notified of the employment practices violating Title VII.

86. Defendant is strictly liable for the sexual discrimination that Porter, Williams, Harsy, and the Office Manager engaged in towards Plaintiff and other women.  Defendant is vicariously liable for the sexual discrimination that other employees, including Scott, engaged in towards Plaintiff and other females.

87. As a proximate result of this discrimination, the Plaintiff has lost wages, employee benefits, and suffered humiliation, pain and mental anguish as described above.

WHEREFORE, Plaintiff seeks all damages to which she is legally entitled as a result of Defendant's violations of her rights including:

a.   Lost Wages

b.   Humiliation

c.   Pain and Mental Anguish

d.   Attorney's Fees

e.   Such other relief as this Court deems fair and equitable.

<u>COUNT II:  SEXUAL HARASSMENT UNDER TITLE VII</u>

88. Plaintiff realleges the above stated paragraphs of this Complaint as if stated herein.

89. Title VII prohibits employment discrimination based on race, color, religion, sex, and national origin.  Title VII also prohibits an employer from retaliating against an employee who opposes sexual harassment in the workplace.  42 U.S.C. § 2000e et seq.

90. Defendant is a person within the meaning of 42 U.S.C. § 2000e(a) and an employer within the meaning of 42 U.S.C. § 2000e(b).

91. Plaintiff is an employee within the meaning of 42 U.S.C. § 2000e(f).

92. The Defendant violated Plaintiff's rights by subjecting Plaintiff to sexual harassment and failing to enact adequate remedial measures upon being informed of sexually harassing conduct being committed against Plaintiff and other women in violation of Title VII, 42 U.S.C. 2000e-2 by (1) subjecting Plaintiff and other women to verbal harassment by calling them by sexually derogatory terms, including but not limited to "Cunty", "Bitches", and "Big Tittie Blonde;" (3) scolding Plaintiff and other women for provoking sexual reactions from male employees due to the females' wardrobes and natural body reactions to cold temperatures, (4)  knowingly subjecting Plaintiff to unwanted sexual advances by a coworker, (5) failing to implement prompt remedial measures to prevent male employees from participating in harassing behavior, (6) fostering an environment that granted prestige and status to male employees based upon their sexual exploitation of females, (7) knowingly providing space, such as the "Party Barn," for male employees to engage in their sexual exploitations.

93. The Defendant did not have adequate policies or procedures in place to address sexual harassment, nor did it implement prompt remedial measures when notified of the employment practices violating Title VII.

94. Defendant is strictly liable for the sexual harassment that Porter, Williams, Harsy, and the Office Manager engaged in towards Plaintiff and other women.  Defendant is vicariously liable for the sexual harassment that other employees, including Scott, engaged in towards Plaintiff and other females.

95. As a proximate result of this harassment, the Plaintiff has lost wages, employee benefits, and suffered humiliation, pain and mental anguish as described above.

WHEREFORE, Plaintiff seeks all damages to which she is legally entitled as a result of Defendant's violations of her rights including:

a.  Lost Wages

b.  Lost Benefits

c.  Humiliation

d.  Pain and Mental Anguish

e.  Attorney's Fees

f.  Such other relief as this Court deems fair and equitable.

<u>COUNT III:  RETALIATION FOR OPPOSING SEXUAL HARASSMENT</u>

96. Plaintiff incorporates the above paragraphs of this Complaint by reference.

97. Title VII also prohibits an employer from retaliating against an employee who opposes sexual harassment in the workplace.  42 U.S.C. § 2000e et. seq.

98. Defendant violated Title VII when it retaliated against Plaintiff by (1) placing Plaintiff in remedial training, (2) openly berating Plaintiff in front of her coworkers, (3) reassigning Plaintiff to an Inside Sales Position, (4) subjecting Plaintiff to a hostile work environment, (5) refusing to provide Plaintiff with a company vehicle, and (6) terminating Plaintiff under false pretenses.

99. The Defendant did not have adequate policies or procedures in place to address retaliation, nor did it implement prompt remedial measures when notified of the employment practices violating Title VII.

100.       Defendant is strictly liable for the retaliation that Porter, Williams, Harsy, and other supervisory personnel engaged in towards Plaintiff.  Defendant is vicariously liable for the retaliatory conduct engaged in by Plaintiff's coworkers towards Plaintiff.

101.     As a proximate result of this retaliation, the Plaintiff has lost wages, employee

benefits, and suffered humiliation, pain and mental anguish as described above.

WHEREFORE, Plaintiff seeks all damages to which she is legally entitled as a result of

Defendant's violations of her rights including:

g.  Lost Wages

h.  Lost Benefits

i.  Humiliation

j.  Pain and Mental Anguish

k.  Attorney's Fees

l.  Such other relief as this Court deems fair and equitable.

COUNT IV:  RETALIATORY DISCHARGE

102.     Plaintiff realleges the above stated paragraphs as if restated herein.

103.     It shall be an unlawful employment practice for an employer to discharge or

otherwise discriminate against an individual with respect to her compensation, terms,

conditions, or privileges of employment because of that individual's sex.  42 U.S.C. §

2000e-2.  Furthermore, it shall be unlawful for an employer to limit or classify its

employees or applicants for employment in any way which would deprive or tend to

deprive any individual employment opportunities.  *Id*.

104.     It is the public policy of the State of Illinois to provide individuals freedom from

discrimination on the basis of her race, color, religion, sex, national origin, ancestry, age,

marital status, military status, sexual orientation, pregnancy, etc.  775 ILCS 5/1-102, ¶ A.

It is also the public policy to prevent individuals from being subject to sexual harassment

as a condition of employment.  *Id*. at ¶ B.

105.    The tort of retaliatory discharge is "an exception to the general rule that an "at-will" employment relationship is terminable at any time for any or no cause." *Palmateer v. International Harvestor Co.*, 85 Ill. 2d 124, 128 (Ill., 1981). "When a discharge contravenes public policy in any way, the employer has committed a legal wrong." *Id.* at 130.

106.    Plaintiff refused to be subjected to sexual harassment as terms of employment.

107.    Following Plaintiff's refusal, Defendant engaged in a systematic scheme of retaliation by (1) placing Plaintiff in remedial training, (2) openly berating Plaintiff in front of her coworkers, (3) reassigning Plaintiff to an Inside Sales Position, (4) subjecting Plaintiff to a hostile work environment, (5) refusing to provide Plaintiff with a company vehicle, and (6) terminating Plaintiff under false pretenses.

108.    Defendant is liable for retaliatory acts up to and including retaliatory discharge, Plaintiff suffered lost wages, lost benefits, humiliation, pain and anguish.

WHEREFORE, Plaintiff seeks all damages in which she is legally entitled as a result of Defendant's violations including:

   a.  Lost Wages

   b.  Lost Benefits

   c.  Humiliation and Embarrassment

   d.  Pain and Anguish

   e.  Litigation Expenses including Attorney's Fees

   f.  Any other relief this Court deems just and proper

<u>COUNT V:  BREACH OF CONTRACT</u>

109.    The Plaintiff realleges the above stated paragraphs as if fully set forth herein.

110.     "Employment at will is not a state of nature but a continuing contractual

relationship." *McKnight v. GMC*, 908 F.2d 104, 109 (7th Cir., 1990).  Wages, benefits,

duties, working conditions, and all (but duration) other terms are specified and a breach

of *any one of them* will give the employee a cause of action for breach of contract.  *Id*.

111.     In Illinois, under the employment-at-will doctrine, employers may discharge

employees for any reason or for no reason at all, as long as they do not violate public

policy.  *Palmateer v. International Harvestor Co.*, 85 Ill. 2d 124, 128 (Ill., 1981).  The

duty of good faith is a principle of contract interpretation.  *Vickers v. Abbott Labs.*, 308

Ill. App. 3d 393, 409 (Ill. Ct. of App., 1st Dist., 1999).

112.     The Plaintiff and Defendant entered into a contract on or about June 23, 2015,

whereby Defendant agreed to pay the Plaintiff for performing the work duties assigned.

Additionally, Defendant agreed to provide Plaintiff with the tools necessary to perform

those duties, including, but not limited to, proving Plaintiff with a work vehicle, company

credit card, company gas card, and corporate lodging card.

113.     The Plaintiff fulfilled the contract by performing her work duties in accordance

with her employment contract.

114.     The Defendant breached the contract by (1) reassigning Plaintiff to an Inside

Sales Position, (2) refusing to provide Plaintiff with a company vehicle, (3) refusing to

provide Plaintiff with a company credit card in timely fashion, (4) preventing Plaintiff

from using personal phone to conduct work related business and (5) subjecting Plaintiff

to a hostile and intimidating work environment as a condition of employment.

115.     Furthermore, the Defendant failed to act in good faith, thereby breaching the

contract, by (1) placing Plaintiff in remedial training under false pretenses, (2) hindering

Plaintiff in the performance of her contractual duties, and (3) terminating Plaintiff under false pretenses.

116.      The Plaintiff suffered damages as a result.

117.      The Plaintiff seeks all damages to which she is legally entitled as a result of the Defendant's breach of the contract.

WHEREFORE, Plaintiff seeks all damages in which she is legally entitled as a result of Defendant's violations including:

a.  Lost Wages

b.  Lost Benefits

c.  Humiliation and Embarrassment

d.  Pain and Anguish

e.  Litigation Expenses including Attorney's Fees

f.  Any other relief this Court deems just and proper

<u>CONCLUSION</u>

WHEREFORE, cause having been shown, Plaintiff prays for an order entering judgement granting the foregoing requests as well as any such other relief this Court deems just and fair.

<u>JURY DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury on all issues triable by a jury.

Respectfully submitted,

KAUFHOLD & ASSOCIATES, P.C.


By:    */s/ Kevin C. Kaufhold*
       Kevin C. Kaufhold, # 6180295
       KAUFHOLD & ASSOCIATES, P.C.
       5111 West Main Street, Lower Level
       P.O. Box 23409
       Belleville, Illinois 62226
       Telephone:    618-235-3580
       Facsimile:    618-235-7150
       Attorney for Plaintiff