IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| AMY SWYEAR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.  16-cv-1214-SMY-RJD |
| | ) |
| | ) |
| FARE FOODS CORPORATION, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S COMBINED MOTION FOR SUMMARY JUDGMENT
AND SUPPORTING MEMORANDUM**

NOW COMES Defendant Fare Foods Corporation ("Fare Foods"), by and through its attorneys, Rhode & Jackson PC, and for its Combined Motion for Summary Judgment and Supporting Memorandum thereto pursuant to Fed. R. Civ. P. 56 and SDIL – LR 7.1(c), states as follows:

**Introduction**

Plaintiff Amy Swyear filed an Amended Complaint (Doc. 22) against her prior employer, Fare Foods, alleging that she was subjected to sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964.  42 U.S.C. § 2000e *et seq.*  By Plaintiff's own admissions in her deposition, the record clearly demonstrates that Plaintiff cannot state a claim for either sexual harassment or retaliation under Title VII and therefore summary judgment in Fare Foods' favor is proper.[1]

**Factual Background**

Fare Foods is in the business of providing food products and supplies to the concessionaire industry.  Fare Foods extended an offer of at-will employment to Plaintiff on June

---

[1]  Plaintiff also made a claim of breach of contract which the Court has dismissed.  (Doc. 41).

1

18, 2015.  Plaintiff began her employment as an Outside Sales Representative ("OSR") with Fare Foods on June 22, 2015.  OSRs travel to various locations within the Midwest to serve various customers at fairs and conventions.  (Doc. 22 ¶ 19).  Plaintiff Amy Swyear was employed by Fare Foods for only approximately six (6) weeks.  (Ex. A[2] at 84).

During the week of July 13, 2015, Plaintiff was on a multi-stop delivery/sales trip in northern Illinois and eastern Iowa.  (Doc. 22 ¶ 31).  On July 15, 2015, Plaintiff met up with another OSR, Russ Scott ("Scott"), at a fair in or around East Moline.  After visiting with customers, both Plaintiff and Scott stayed at the Lodge Hotel in Bentonville, Iowa.  (Doc. 22 ¶ 37).  After checking in and inspecting their respective rooms which were assigned by the motel and located next to each other, Plaintiff claims that Scott followed her into her room on the pretense of checking the air conditioner because the room was warm.  (Doc. 22 ¶ 40).  Plaintiff states that this made her feel uncomfortable so she ushered Scott to the hotel restaurant for dinner.  (Doc. 22 ¶ 41).

On the way to dinner, Plaintiff alleges that Scott began to rub her back.  (Doc. 22 ¶ 42).  At dinner, Plaintiff found it offensive that Scott wanted to pull her chair out for her.  (Ex. A at 112).  Plaintiff assumed Scott had ulterior motives and was not just being a gentleman.  Walking back to their rooms after dinner, Plaintiff said that Scott "propositioned" her to take a swim in the hotel pool, which she declined.  (Doc. 22 ¶ 45).  When they returned to their rooms after dinner, Plaintiff claims that Scott crawled into her bed.  Plaintiff states that she told Scott she was tired so he left.  (Doc. 22 ¶¶ 47-48).  Plaintiff claims that as Scott left, he told her that "if [she] decide[d] to watch a movie, [he] would be [her] cuddle buddy."  (Doc. 22 ¶ 49).  Scott left the room but later knocked on Plaintiff's door.  She did not answer.  Scott then attempted to call

---

[2]  The transcript from Plaintiff's deposition taken on June 7, 2017, is attached hereto and referenced herein as Exhibit A.

Plaintiff. Again, she did not answer. The next morning, Scott called Plaintiff to let her know he had already left and was on the road. (Ex. A at 122).

A week later, on July 23, 2015, Plaintiff had a meeting with Scott Harsy ("Harsy"), Administrative Supervisor, and her immediate supervisor, Robbie Williams ("Williams"). (Ex. B[3]). At that meeting, Plaintiff was given specific directions to improve her work. (Ex. C[4]). Examples of the directives which Plaintiff was given included items such as making contact with customers, providing daily reports or texts regarding what she did and what customers she made contact with each trip. Williams also stressed to Plaintiff that she needed to ask questions if she was unclear on something or needed clarification on a directive.

It was after this meeting on July 23rd that Plaintiff went back to Harsy's office to discuss the events of July 15, 2015. (Ex. D[5]) Plaintiff told Harsy that Scott's comments made her feel very uncomfortable. (Ex. D at 1). Plaintiff also told Harsy that while she felt like she was in control of the situation, she thought she should report it. (Ex. D at 2). Harsy asked Plaintiff to write up her complaint but she never did. (Ex. A at 160-61).

Despite her failure to write up any complaint, Harsy conducted an investigation. He interviewed the only other party to the alleged events, Scott. (Ex. E[6]). Scott denied any sexual harassment. With no third party witnesses or objective evidence, there was no basis for Harsy to take any disciplinary action. Harsy did, however, ensure that Plaintiff and Scott did not work together in any capacity after July 15, 2015. Plaintiff admits she never had to work with Scott again. (Ex. A at 206).

---

[3] Scott Harsy's Affidavit is attached hereto and referenced herein as Exhibit B.
[4] Harsy's notes of the meeting between Robbie Williams, Plaintiff, and himself on July 23, 2015, are attached hereto and referenced herein as Exhibit C.
[5] Harsy's notes regarding his meeting with Plaintiff in which she informed him of the events of July 15, 2015, are attached hereto and referenced herein as Exhibit D.
[6] Harsy's notes reflecting his interview with Russ Scott concerning the events of July 15, 2015, are attached hereto and referenced herein as Exhibit E.

In her Amended Complaint, Plaintiff claims she "felt humiliated, embarrassed, insulted, uncomfortable and frightened" because of the events on July 15, 2015.  (Doc. 22 ¶ 52).  Plaintiff admits she does not claim that Scott did anything she believes was sexual harassment after July 15, 2015.  (Ex. A at 124-25).  Additionally, Plaintiff makes no claim, much less offers any evidence, that the events claimed on July 15, 2015, interfered with or adversely effected her work environment.

On or about August 6, 2015, Plaintiff received a telephone call from Williams who told her that it just was not working out.  (Ex. A at 138).  Plaintiff admits that even she thought something was off from the beginning of her employment.  (Ex. A at 157).

### Legal Standard for Summary Judgment

"[I]f the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law", summary judgment should be granted to the movant. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014).  In determining whether there are any material disputed facts, the court must view the evidence and draw all inferences in favor of the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

To survive summary judgment, the non-moving party must establish that some genuine disputed issue of material fact exists from which a reasonable jury could return a verdict in the non-moving party's favor.  *Makowski v. SmithAmundsen, LLC*, 662 F.3d 818, 822 (7th Cir. 2011).  "A party who bears the burden of proof on a particular issue may not rest on [her] pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial."  *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007).  The non-moving party cannot rely upon conclusions.  *Payne v. Pauley*,

4

337 F.3d 767, 773 (7th Cir. 2003).  Further, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**Plaintiff's Admissions Prove She has No Claim for Sexual Harassment**

To state a claim for sexual harassment under Title VII, a plaintiff must prove that:  "(1) she was subjected to unwelcome harassment; (2) the harassment was based on her sex; (3) the harassment was sufficiently severe or pervasive so as to alter the condition of her employment or abusive atmosphere; and (4) there is a basis for employer liability."  *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007).  Although Plaintiff lacks evidence to support each of the four required elements, the Court can determine that Fare Foods is entitled to summary judgment by simply looking at the third element which requires that the alleged harassment must be sufficiently severe or pervasive so as to alter Plaintiff's work environment. Even assuming Scott did and/or said the things that Plaintiff alleges he did on July 15, 2015, the alleged conduct was neither severe nor pervasive as required to constitute sexual harassment under Title VII.  Nor does Plaintiff have any evidence that the events of July 15, 2015, as she presents them altered the conditions of her employment with Fare Foods as required to state a claim under Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).

Viewing Plaintiff's testimony in the light most favorable to her as the Court must do, Plaintiff's own words prove that Scott's alleged behavior was neither severe nor pervasive.  To begin with, Plaintiff testified that Scott's behavior occurred on a single day, July 15, 2015.  One day is not pervasive.  Therefore, the only question for the Court is whether Scott's alleged behavior on July 15, 2015, was severe.  The answer is clearly no.

Plaintiff alleges that Scott engaged in the following behaviors on July 15, 2015:

5

- While introducing Plaintiff to one client, Scott informed the client that Scott and Plaintiff were "going back to get a room;" implying to the client that the two intended to stay together that night.

- Upon returning to the parking lot of the fairgrounds, Scott began looking up overnight corporate lodging availability. While doing so, Scott began brushing up against Plaintiff acting as if he were attempting to read her phone screen.

- When the two went to their rooms, Scott invited Plaintiff into his room. When Plaintiff did not take the invitation, Scott followed Plaintiff into her room. Scott claimed to be inspecting the air conditioner, as it was so warm in Plaintiff's room.

- While in the elevator, Scott began rubbing Plaintiff's back.

- Additionally, Scott attempted to guide Plaintiff to a secluded portion of the hotel when the elevator "mistakenly" stopped in the hotel's basement.

- While walking back from dinner, Scott propositioned Plaintiff to take a swim in hotel's pool. When Plaintiff informed Scott that she did not bring a swimsuit with her, Scott stated "well, that's no problem" and laughed.

- A short time later, after Plaintiff returned from grabbing her belongings from her work vehicle, Scott followed Plaintiff into her room and crawled into Plaintiff's bed.

- Scott pushed up against Plaintiff as she began to open her IPAD.

- As Scott exited the room, Scott stated "well, if you decide to watch a movie, I will be your cuddle buddy. I love to cuddle."

- Scott did not make it into his adjacent room without soliciting Plaintiff to check his air conditioner to see if it was working properly. Plaintiff, finding nothing obviously wrong, stated it may take a while for it to cool the room down.

- Scott responded by commenting how the beds did not have heavy blankets on them. Scott then propositioned Plaintiff to spend the night with him again by stating "What we ought to do is get the blanket from all four (4) beds and just sleep in one (1) together to stay warm.

- Upon entering her room, Plaintiff took a shower. While in the shower, Scott called Plaintiff's phone. When Plaintiff did not answer, Scott began knocking at the door. Plaintiff, feeling frightened, did not open the door. In fact, Plaintiff left the water running in the shower in hopes Scott would hear it and go back to his room. Scott continued to take turns knocking on door with each turn getting more aggressive.

6

- Plaintiff turned off the shower after letting it run for an hour. Plaintiff texted Scott to inform him she was in the shower. Scott waited about ten minutes or so before returning to Plaintiff's door in hopes of gaining entry again. Again, Plaintiff ignored his knock.

(Doc. 22, ¶¶ 34, 36, 40, 42, 43, 45, 47, 48, 49, 50, 51, 53, and 54).

"Deciding whether a work environment is hostile requires consideration of factors like the frequency of improper conduct, its severity, whether it [was] physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interfered with the [plaintiff's] work performance." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016). Plaintiff has none of these factors. The most arguably offensive comment Scott made was to suggest that he and Plaintiff "cuddle" and watch a movie. Plaintiff did not want to cuddle and declined Scott's invitation to cuddle. There was no further discussion of cuddling and Scott made the comment as he left Plaintiff's room.

American workers spend a great deal of time at work and meet many co-workers with whom they might have a social relationship. Some co-workers even date and get married. It does not constitute sexual harassment for an employee to ask a co-worker whether he or she is romantically interested. If sexual harassment made it illegal for one co-worker to even suggest to another co-worker that they have sex, let alone just cuddle, the courts would have no time for any other cases. Illegal sexual harassment only occurs when one person engages in unwelcomed, sexual offensive behavior persistently and/or aggressively. Even then, the non-willing individual still has to demonstrate that the alleged harassing conduct interfered with her work environment. Plaintiff has no evidence of any of these things.

The Seventh Circuit noted that "a certain amount of 'vulgar banter, tinged with sexual innuendo' is inevitable" in the workplace. *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997). Scott's behavior might have been tinged with sexual innuendo, but it did not

7

constitute unlawful sexual harassment. *Baskerville v. Culligan International Co.*, 50 F.3d 428, 430 (7th Cir. 1995). Scott did not make any threats or lewd comments. Scott's remarks were at most "isolated and/or trivial remarks of a sexual nature [which] do not satisfy the definition of sexual harassment." *Gleason* at 1143. Scott's suggestive comments "falls far short of the degree of harassment that creates a hostile working environment actionable under Title VII." *Yuknis v. First Student, Inc.*, 481 F.3d 552, 553 (7th Cir. 2007).

### Plaintiff Presented No Evidence of a Sexually Hostile Work Environment by Others

Plaintiff claims that the use of some arguably offensive nicknames on occasion by some co-workers created a sexual hostile environment. (Doc. 22 ¶ 70). Specifically, Plaintiff claims to have heard co-workers refer to certain men and a woman by nicknames she found offensive like "Bitchy Richie" (male), "Nipps" (male), and "Cunty" (female). (Ex. A at 80). Plaintiff also claims that on occasion her co-workers discussed the sexual exploits of Scott. (Ex. A at 86).

Sexual harassment must be based on the plaintiff's gender – not be merely gender-related. *Galloway v. G.M. Serv. Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996). Plaintiff admitted that the nicknames she testified to as offensive to her were made about both men and women. (Ex. A at 87). While such nicknames may be childish, boorish or even offensive, the nicknames were equally childish or boorish to men and women. Additionally, Plaintiff admits that none of the nicknames were used to refer to her. (Ex. A at 80–81). While Plaintiff's co-workers' comments may have been inappropriate, unprofessional, or disrespectful, such comments did not demonstrate hostility toward women specifically. Even if this were not true, the comments Plaintiff claims were made were neither sufficiently severe nor pervasive enough to create a sexually hostile work environment and certainly did not unreasonably alter her work environment.

Plaintiff also complains that co-workers made comments or expressed rumors about the sexual exploits which allegedly occurred in a building called the "Party Barn". (Doc. 22 ¶¶ 76-79). The "Party Barn" is a building near but apart from Fare Foods' offices which was built for the owner's parents to reside in when vacationing. It is essentially a pole barn which was converted into a fully equipped two (2) bedroom apartment with a large space to park a recreational vehicle. It is also offered to employees as a place to stay in lieu of a motel when they return late in the evening from sales calls or deliveries and they are not within a short traveling distance back home. The "Party Barn" was named by Ron and Laura Porter's daughter when she was six or seven years of age and the name stuck[7]. Whatever did or did not occur at the "Party Barn", Plaintiff admitted she never personally experienced or observed any allegedly offensive behavior in the "Party Barn". (Ex. A at 171).

While Plaintiff's co-workers did not create a sexually hostile work environment, even if they did, an employer is not liable unless the employer knows and failed to take corrective action. *Doe v. RR Donnelley & Sons, Co.*, 42 F.3d 439, 446 (7th Cir. 1994). Plaintiff admits she never told her co-workers or Human Resources that she was offended by these nicknames or discussions. (Ex. A at 85). Plaintiff says she told Williams that she thought her co-workers' comments were disrespectful to *both* men and women (Ex. A at 87). Even though Williams was Plaintiff's supervisor, disrespectful hardly constitutes a complaint of sexual harassment. Further, Plaintiff never told Williams that the comments were of a sexual nature. (Id.). Plaintiff merely said that they were "rude". (Id.). Disrespectful or rude comments do not create a sexually hostile environment. Not only did Plaintiff tell her supervisor that these comments made her uncomfortable and aggravating, as opposed to sexually harassing, she also told her attorney's law

---

[7] Affidavit of Laura Porter is attached hereto and referenced herein as Exhibit F.

9

clerk the same thing in their initial consultation.  (Ex. G[8] at 7, 12).

## Plaintiff Offered No Evidence of Unreasonable Interference with Her Workplace

A hostile work environment exists only where the conduct complained of by the plaintiff had "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."  *Meritor Sav. Bank, FSB* at 65 (1986).  With respect to the events involving Scott on July 15, 2015, Plaintiff does not claim they interfered with her work environment.  In fact, Plaintiff never worked with Scott after July 15, 2015.  (Ex. A at 206).  With respect to the use of various nicknames Plaintiff discussed or the discussions she attributes to her co-workers about the "Party Barn", Plaintiff also failed to identify any way in which these comments even allegedly interfered with her work environment.

Title VII was "not designed to purge the workplace of vulgarity" or even "vulgar banter, tinged with sexual innuendo."  *Gleason* at 1144 (7th Cir. 1997).  The Seventh Circuit has said that there is a "safe harbor for employers in cases which the alleged harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe that she has been discriminated against on the basis of sex."  *Galloway v.* at 1168 (7th Cir. 1996).  None of the conduct described by Plaintiff "unreasonably interefere[d] with [her] work performance."  *Saxton v. AT & T, Co.*, 10 F.3d 526, 534 (7th Cir. 1993).  Even if these comments and references were made and repeated later to Plaintiff, such comments are not sufficient evidence to withstand summary judgment of a hostile environment claim.

## Plaintiff Cannot Establish Retaliation

To establish a claim of retaliation, a plaintiff must "show [ ] that: (1) she engaged in

---

[8]  The transcript from Plaintiff's follow-up deposition taken on August 7, 2017, is attached hereto and referenced herein as Exhibit G.

10

statutorily protected activity; (2) she suffered a materially adverse action; and (3) a causal connection exists between the two." *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008) (internal citations omitted). With respect to the first element, Plaintiff must demonstrate she engaged in an activity protected by Title VII. To engage in the required protected activity, a plaintiff has to show that she complained about conduct that a *reasonable person* would believe amounted to an unlawful employment practice. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631-32 (7th Cir. 2011).

Scott's conduct is not automatically sexual harassment "merely because the words used [had] sexual content or connotations." *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80 (1998). To be actionable, the conduct complained of by Plaintiff was not objectively sexual harassment proscribed by Title VII. *Nair v. Nicholson*, 464 F.3d 766, 769 (7th Cir. 2006) (Title VII "forbids an employer to discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by [Title VII]"). No reasonable person would find the events of July 15, 2015, constituted sexual harassment in the workplace and therefore the Court's inquiry should end here.

For argument purposes only, even had Plaintiff engaged in a statutorily protected activity, she still has to have evidence that such activity is causally connected to her termination. Plaintiff says she was "trying to figure out why [she] got fired." (Ex. G at 13). Not only did Plaintiff not engage in protected activity under Title VII, she has nothing but her personal belief that she was fired for making Harsy aware of Scott's alleged behavior on July 15, 2015. All Plaintiff has is the short time between June 22, 2015, and August 6, 2015. A short time period by itself will "rarely be sufficient in and of itself to create a triable issue." *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005). "Suspicious timing may be just that – suspicious – and a suspicion is

not enough to get past a motion for summary judgment." *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011).

It is not sufficient that there *might* be some causal connection between the exercise of the protected activity and the adverse action. Plaintiff must prove that but-for engaging in the protected activity, she would not have been terminated. *Univ. of Tex. Southwestern Med. Ctr. v. Nasser*, 133 S.Ct. 2517, 2534 (2013). A court should intervene "only where an employer's reason for [termination] is without factual basis or is completely unreasonable." *Burton v. Bd. of Regents*, 851 F.3d 690, 698 (7th Cir. 2017).

Plaintiff has nothing but speculation or conjecture to support her claims of retaliation; neither of which will save her claims. *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015). Fare Foods is therefore entitled to judgment as a matter of law on Plaintiff's retaliation claim.

### Plaintiff Needs No Further Discovery to Respond to Defendant's Motion for Summary Judgment

In anticipation that Plaintiff will claim that she needs to engage in discovery before responding to this Motion, such an argument would be specious at best. No one knows more about how Plaintiff was allegedly subjected to sexual harassment than Plaintiff. Plaintiff's Amended Complaint and her deposition prove that as a matter of law, she has no case. Most critically, Plaintiff did not complain that she was subjected to sexual harassment until she filed with the Illinois Department of Human Rights in December 2015.

### Conclusion

Plaintiff cannot produce any evidence that would allow a reasonable jury to conclude that she was subjected to sexual harassment in her workplace nor that she engaged in protected activity as defined under Title VII nor that there is a causal connection between her complaint of behavior that made her uncomfortable to Fare Foods and her termination. For these reasons,

Fare Foods respectfully requests this Honorable Court to enter judgment in its favor.

                              Respectfully submitted,
                              Fare Foods Corporation, Defendant

                  By:    s/Shari R. Rhode
                              Shari R. Rhode, one of Defendant's Attorneys
                              Attorney #2324598
                              Rhode & Jackson, PC
                              1405 W. Main
                              Carbondale, IL.  62901
                              Telephone: 618.529.8092
                              Facsimile:  618.529.8582
                              Email: srhode@rhodeandjackson.com