UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| AMY SWYEAR )<br>)<br>Plaintiff, )<br>) | Case No.  16-cv-1214-SMY-RJD |
| )<br>) | JURY TRIAL DEMANDED |
| FARE FOODS CORPORATION )<br>)<br>Defendant. )<br>) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGEMENT**

Plaintiff, Amy Swyear (hereinafter "Ms. Swyear"), filed an Amended Complaint (Doc. 22) on or about March 23, 2017, against Defendant, Fair Foods (Hereinafter "Fare Foods"), alleging claims of sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964.  Before completing the discovery process and while not complying with discovery requested by Plaintiff, Defendant filed a Motion for Summary Judgement (Doc. 46) on or about September 11, 2017.  Defendant's motion is ahead of time and a thinly-veiled attempt to cut off Plaintiff's right to discovery.

Among other things, Defendant claims in their Motion that no dispute of material fact exists and that Ms. Swyear's own admissions prove that she cannot state a claim for which relief can be granted.  (Doc. 46 at 1).  There is irony to be found with Defendant's Motion in that Defendant continues to not supply discovery while simultaneously claiming there is no material factual dispute.  Another issue with Defendant's Motion is the bold assertion that Ms. Swyear's deposition testimony in some way admits that a claim for relief cannot be granted.  Id.  This particular assertion is based on Ms. Swyear's statement during deposition that she was "in

control" during the time while her male colleague, whose sexual conquests were known, celebrated, and regularly discussed "around the water cooler," persistently and repeatedly attempted sexually assaulting her. (Def.'s Ex. D at 2). The significance of Ms. Swyear's statement is not found in the legal context as Defendant claims, but rather in the practical context: Had Ms. Swyear not been in control, had she not actively rebuffed her male colleague over and over, had she not been responsible for her own actions as well as for those of her male colleague then this case would be in a criminal court - Ms. Swyear's lack of consent was crystal clear. This claim by Defendant is a veiled attempt at victim blaming and is grotesque and nothing less than absurd.

## LAW

The moving party is entitled to summary judgment when there is no dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir., 2014). When deciding whether summary judgment is appropriate, the court considers all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is inappropriate if a genuine issue of material fact remains disputed. *Boumehdi v. Plastic Holdings, LLC*, 489 F.3d 781, 787 (7th Cir., 2007)

To meet her burden of proof, the Plaintiff must show that (1) she was subjected to unwelcome harassment, (2) the harassment was based upon her sex, (3) the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and create a hostile or abusive environment, and, (4) there is a basis for employer liability. *Id*. at 788. To be severe and pervasive, Ms. Swyear must show that the complained behavior was objectively and

subjectively offensive. *Id.* Ms. Swyear's complaints to the company and this Court are sufficient to establish the actions were subjectively offensive. *Id.*

Defendant only focuses on element three (3); arguing the actions are not sufficiently severe or pervasive, presumably under the objective standard. (Doc. 46 at 5). To get there, the Defendant claims only one isolated incident occurred. *(Id.)* Defendant admits to several other "isolated" incidents involving sexually inherent derogatory comments to women; justifying the use of such terms as "Cunty" and "Big Tittie Blonde Carnie" as being the equivalent of nicknaming a male employee "Bitchy Ritchie". (*Id.* at 9). As argued by the Defendant, given that each is viewed in isolation, each incident fails to reach the objective threshold.

Plaintiff alleges the Defendant operates his business with an environment so utterly offensive that it violates the very conscious of society. The allegations include unequal terms and conditions of employment, harassing comments, hostile environment, as well as the hotel incident. See Amend. Compl. Defendant does not challenge most of the alleged facts. Rather, Defendant argues that each individual instance should (1) be viewed in isolation, and, (2) because the facts are viewed in isolation, the facts are not sufficiently severe or pervasive enough to warrant this action. Defendant's position is incorrect and not supported by legal precedent.

First, courts look at the totality of the circumstances. *Clark County School Dist. v. Breeden* 532 U.S. 268, 270-71 (2001). Second, courts do not identify a "magic" number of events needed to establish a claim as one isolated incident may be sufficient if it is egregious enough. *Cerros v. Steel Technologies, Inc*., 398 F.3d 944, 950 (7th Cir., 2005). Third, typically, sexual harassment is a cumulative process. *Galloway v. General Motors Service Parts Operations*, 78 F.3d 1164, 1166 (7th Cir., 2005). In its earliest stages, it may not cause sufficient distress to warrant making a federal case out of it. *Id.* However, so long as the environment

would be reasonably perceived as hostile and abusive, it is undoubtedly actionable under Title VII. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993). Acts of sexual harassment temporally linked and circumstantially related are considered a single course of conduct. *Galloway*, 78 F.3d at 1166.

> I. When viewed in totality, as required by precedent, the Plaintiff states an actionable claim warranting the trier of fact to resolve several factual disputes.

Defendant's investigation provides the Defendant with awareness that something occurred when Ms. Swyear and Scott met up on July 15, 2015[1]. Defendant claims that this incident should be viewed in isolation and not in conjunction with the (1) unequal terms of employment, (2) harassing and demeaning language used towards females, and (3) the alleged retaliatory actions against Ms. Swyear. And when viewed in isolation, Defendant argues that Plaintiff fails to meet the minimum threshold to state a claim under the law.

Defendant takes a glass half-full view of the allegations. Defendant claims that Scott's request to cuddle and watch a movie are insufficient to meet the Seventh Circuit's standard, as stated in Gleason. *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1144 (7th Cir., 1997)(holding that some sexual comments are inevitable in the American workplace). It further argues that Scott's remarks are "isolated and/or trivial" and, as such, do not meet the minimum threshold of harassment. Doc. 46 at 8.

While creative, Defendant's position is highly suspect. The argument glosses over the investigation conducted by Harsy. Scott admits that inappropriate comments were made regarding the two were getting a room. Doc. 46, Ex. D. Although the parties dispute who made the comment, Defendant refuses to provide contact information to the only third party to hear the

---

[1] Quizzically, Defendant denies anything happened even though Harsy's interview notes corroborate many of Ms. Swyear's allegations.

statement2.  As such, a factual dispute remains in which a reasonable juror could side with the Plaintiff.  Additionally, Scott admitted to Defendant's HR Director that he requested the two sleep together.  *Id.*  While admitting it, Defendant claims that Scott's intentions were pure and he wanted to stay warm during the dog days of summer.  *Id.*  Again, a reasonable juror could find that Scott's attempts to get under the covers were thinly-veiled attempts at sleeping with the Plaintiff; making summary judgment improper. Scott admits to entering Swyear's room and knocking on the door, as alleged by Swyear.  *Id.*  Again, while Scott admits to many of the allegations against him, he denies anything crossed the line.  *Id.*  Given this, summary judgment is inappropriate and should be denied accordingly.

     Separately, Defendant argues that all other off-handed comments are made equally to men and women, and therefore, are not harassing towards women.  Doc. 46 at 9.  Defendant claims that calling a male employee a "bitch" is the equivalent as calling a female employee a "Cunt"3.  *Id*.  Again, Defendant argues the name calling should be viewed separately from the hotel incident.  *Id.*  Defendant, *albeit incorrectly*, invokes the reasoning provided by the Seventh Circuit in *Galloway*.  There, as pertinent here, the Seventh Circuit held: (1) unlawful discrimination is often a cumulative process rather than a one-time event; (2) in order to break the links of causation, the harassment must be so discrete in time and circumstances that they do not reinforce each other; (3) when the derogatory term is ambiguous, context is everything; and (4) use of terms such as "dumb fucking broads" and "fucking cunts" are inherently terms of

---

[2] Plaintiff requested customer information during discovery designed to identify and contact Mr. Enright. Defendant did not comply with the request.

[3] Defendant's argument that calling a male "Bitchie" is equivalent as calling a woman "Cunty".  While *Galloway* expressly argues against the Defendant's position and holds that terms such as "Cunty" and "Big Tittie Blonde Broad" are inherently discriminatory.  Society, as a whole, likely disagrees that the two are created equal.

sexual harassment. See *Galloway*, 78 F.3d at 1166, 1168. Thus, summary judgment should be denied out of hand.

Defendant fails to consider that sexual harassment is considered in the totality of the circumstances. *Cerros*, 398 F.3d at 950. There, the Seventh Circuit provided that *one* (1) event of harassment is sufficient enough if it is egregious and that the number of instances are just one (1) factor. *Id.* Furthermore, the Seventh Circuit went a step further in holding that an unambiguous derogatory term is on the "more severe" end of the spectrum. *Id*. It further held that the employer is liable for coworker's harassment when they are either negligent in discovering or remedying the harassment. *Id*. at 952.

Fare Foods attempts to downplay the facts of the case while engaging in some blatant victim blaming. To support this, Fare Foods provides a scant factual statement as part of its motion; leaving out necessary facts, both those in dispute and those not in dispute.4 In the spring of 2015 Ms. Swyear applied for the position of Outside Sales Representative ("OSR") with Defendant. (Doc. 46 at 2). While interviewing for the position, Ron Porter ("Porter") expressed his fear of hiring women as OSRs because he believed that women were inclined to sexual promiscuity and could not behave themselves while on company travel as women could control their sexual desires. (Doc. 22 at 3). While Porter believed that women were unable to control themselves, Porter exercised that fear by calling Plaintiff's mother to confirm that Plaintiff could control herself while on the road. *Id.* This additional and humiliating bar to employment existed for Ms. Swyear only because of the anti-woman animus that existed at Fare Foods.

After clearing the standard and discriminatory bars to employment, Ms. Swyear began working with Fare Foods as an OSR on June 22, 2015. (Doc. 46 at 2). Ms. Swyear was

---

[4] Fare Foods insufficient facts requires Plaintiff to restate the factual scenario as known to date in order to provide this Court with necessary clarity.

informed that she would begin her time at Fare Foods in training, so that she could learn their system, their inventory, and their customers. (Ex. 1 at 1-2). As an OSR, Ms. Swyear's primary duties were to interact with current and potential customers at fairs and conventions throughout the Midwest and Florida, and to process sales orders. (Doc. 1 Ex. B).

Among the items she was told that she would be provided to assist with her duties was a company credit card, which she never received during her employment despite her repeated requests and the fact that she was regularly tasked with driving to different states and staying overnight on trips. (*Id.*; Doc. 22 ¶ 22-27). Moreover, *all* of her male colleagues received company credit cards, and based upon the scant discovery received thus far at least two (2) of those male colleagues are believed to have received a company credit card within one (1) month after hire. (Ex. 2; Ex. 3). This created a real immediate financial burden that Ms. Swyear was forced to bear while her male colleagues were privy to the company dime. In addition to the immediate financial burden wrought upon Ms. Swyear, in order to be reimbursed for the expenses she had borne she was forced to complete an additional process of paperwork and requests just to get her own money back from the company whose purpose she was furthering. (Doc. 22, ¶¶ 22-27)

The entire process that Ms. Swyear was subjected to regarding money spent while traveling was burdensome and completely different than the breezy process that her male counterparts enjoyed. (*Id.*). Defendant acknowledges creating these unequal terms of employment. Ans. at 7-8. Defendant counter-alleges that it did not give Ms. Swyear a company card due to a standard policy which required an employee to stay with the company for eight (8) weeks before being issued a card. *Id.* Defendant's counter-allegations are unsupported by the written contract given to Ms. Swyear (Amend. Compl. Ex. B), which does not detail any such

policy, nor by the previous actions of the company.  As told by Exhibits 2 and 3, the company provided Williams, who did not travel nearly as extensively, with a company card within 17 days of employment.  Upon information and belief, the Company provided a recently hired male OSR with a card in a similar timeframe[5]

Almost immediately Ms. Swyear noticed that her experience as an OSR with Fare Foods was different than that of her male colleagues, she quickly realized that Fare Foods was a degrading and humiliating place for women to be a woman.  Ms. Swyear and other women at Fare Foods were chastised by their male colleagues and supervisors when their nipples would be visible after being at the freezer.  Amend. Compl. at 10.  Ms. Swyear and the other women were scolded and told that they needed to wear things that would not excite the men, as though it were somehow Ms. Swyear and the other women's fault that the men never matured beyond the early stages of puberty and could not control *their* sexual desires.  *Id.*

Additionally, the employees at Fare Foods regularly used sexually condescending and chauvinist language to describe women and traits within men that they believed to be less than desirable.  For instance, Fare Foods employees routinely referred to one client as "Cunty."  Fare Foods acknowledges awareness of calling the client "Cunty" and justifies it by claiming (1) the female client's name is very similar and (2) the client is an unpleasant person.  Ex. 5.  Additionally, female customers of Fare Foods were referred to as "bitches," and one female customer of Fare Foods in particular was known and regularly talked about as "a typical big tittie blond carney."  (Doc. 22 ¶ 68-78).  Fare Foods justifies this language claiming that it does not violate Title VII as the Company refers to a male employee as "Bitchy Ritchie."  (Doc. 46 at 8-9).  While acknowledging that the use of such language is not actionable when used in non-

---

[5] Plaintiff requested records regarding the issuance of credit cards from Defendant.  To date, Defendant has not responded sufficiently.

gender specific context, Plaintiff alleges these terms are used with the specific intent of being derogatory to females. Amend. Compl. 10-11.

In addition to the discriminatory language used to talk about women, Fare Foods employees celebrated and encouraged men to pursue sexual conquests in an apartment on Fare Foods property known to all as the "Party Barn." Amend. Compl. at 11. Russ Scott ("Scott") was known as a sexual conquistador among the employees at Fare Foods, and Ms. Swyear was fully aware that Fare Foods revered Scott for his sexual proclivities. Defendant encouraged the behavior by joining in the office gossip6. Not only is this evident by the supervisors engaging in the office gossip, it is self-evident by various responses to Ms. Swyear's verbal complaint to Scott Harsy ("Harsy"). During the meeting in which Ms. Swyear informed Harsy of the hotel incident, Harsy responded with "O' god, that Russ". Amend. Compl. at 8. Additionally, while being interviewed by Harsy, Scott defended his unwanted sexual advances by claiming "I was just being myself." Even after Scott admitted to many of Ms. Swyear's allegations, Fare Foods fired Ms. Swyear7 and maintained Scott's employment without any corrective training.

Ms. Swyear first met Scott on the evening of July 15, 2015, when he called her while she was on delivery/sales trip and told her that he was nearby and with some clients that she should be introduced to. (Doc. 22 ¶ 31-32). As the clients, Scott, and Ms. Swyear were getting ready to disburse, Ms. Swyear texted her supervisor, Robbie Williams ("Williams"), and asked if she could proceed to the next stop on her route. (Doc. 22 ¶ 33). Ms. Swyear knew about Scott's reputation within the Company and she did not want to be in a situation where Scott would attempt having sex with her. (Doc. 22 ¶ 76-77). Williams texted back, "Stay and hang." (Doc.

---

[6] Multiple high level supervisors (Porter, Harsy, and Williams) acknowledge Scott's reputation and engaging in discussions around the office regarding the behavior.
[7] In hindsight, Fare Foods claims the termination occurred due to Plaintiff's poor performance.

22 ¶ 33). Uncomfortable with her supervisor's order to "stay and hang," but fearing that disobedience in this moment could cost her job, Ms. Swyear resolved herself to maintaining control of the situation to ensure that Scott would clearly understand that she was not interested in having sex with him. (Def.'s Mot. for Summ. Judg. Ex. D at 2). Defendant attempts to argue that maintaining control and fending off Scott's unwanted advances are sufficient to defeat her claims. (Doc. 46 at 7). This argument holds no credibility.

Before Ms. Swyear and Scott even left their meeting with the clients it was confirmed that Ms. Swyear was justified in resolving herself to maintain full control over herself and the situation, as Scott informed the clients in a suggestive manner that he and Ms. Swyear were "going back to get a room." (Doc. 22 at 34). Scott's comment made one of the clients, John Enright, feel uncomfortable, as he believed it to be inappropriate. Ex. 4. Exercising control over the situation, Ms. Swyear quickly extinguished the implication that she and Scott were getting a room together by informing the clients that the two were in fact getting separate rooms. (Doc. 22 at ¶ 35). Shortly thereafter, while Ms. Swyear and Scott were in the fairgrounds parking lot deciding on a hotel to stay at, the situation between her and Scott was reconfirmed to be as she feared, as Scott placed his body against hers, invading her privacy pretending that he was trying to read what was on her phone. (Doc. 22 at 36). Rather than pick a nearby hotel, Scott picked a hotel nearly an hour away that took Swyear nearly two hours off course8. (Doc. 46 at 36). When a hotel had been decided upon, Scott told Ms. Swyear to follow him there. (Doc. 22 at 37). Feeling extremely uncomfortable with the situation, Ms. Swyear texted Williams again asking if she could go ahead and proceed to her next stop. (Doc. 22 at 38). Again, her

---

[8] Defendant does not justify condoning its staff venturing so far off course. This is especially trouble-some when compared with Defendant's reasons for termination; claiming that Ms. Swyear was off-course. Ms. Swyear argues she was meeting a potential client on Defendant's behalf.

supervisor told her not to go to her next stop, but to stay along with Scott. (Doc. 22 at 35-38). This is highly suspect given that, by all accounts, Scott had no intention of introducing Ms. Swyear to any more clients, which is Defendant's reasons for putting the two together that day.9 Additionally, the circumstances *arguably* infer that Scott picked a hotel nearly an hour off-course in an effort to further isolate Ms. Swyear.10  While Defendant expressly condemns Ms. Swyear for going off-course two hours in an effort to make a sale pursuant to a directive given by the owner's son (Doc. 46 at 1), the Defendant inconceivably supports two employees going two hours off course prior to Ms. Swyear's sexual harassment complaints.11

After arriving at the hotel Scott requested the front desk staff to place him and Ms. Swyear in neighboring rooms. (Ex. 4). The hotel accommodated the request. As the two were entering their respective rooms Scott invited Ms. Swyear to join him in his room. When Ms. Swyear declined the invitation, Scott proceeded to follow her into her room under the pretense that he was "inspecting the air conditioner" because it was warm. (Doc. 22 at 40). This alarmed Ms. Swyear and made her feel vulnerable and extremely uncomfortable, and as though Scott's intent to have sex with her was iron-clad. (Doc. 22 at 41). She and Scott both knew that his explanation for entering her room uninvited was a pretense, because Scott had no knowledge of the temperature in her room prior to this moment, as this was his first time in there. (Doc. 22 at 40). Demonstrating control over the situation again, Ms. Swyear exited her room into the hallway hoping that Scott would follow. (Doc. 22 at 39-41).

---

[9] Fare Foods does not provide that any explanation for making Swyear spend the evening with Scott. Scott and Swyear did not interact, nor did they intend to interact, with any potential or actual clients for the rest of the evening.

[10] Questions remain why Scott picked the hotel given that it took both employees off course. Further discovery is needed to resolve these questions.

[11] Fare Foods' support of Scott's actions raises the inference that Fare Foods supported Scott's unwanted sexual advances and "served" the Plaintiff up as a potential sexual conquest. To date, Fare Foods provides no legitimate business reason, nor have they condoned, the OSRs going so far off-course.

When the two were both in the hallway Ms. Swyear thought it a good idea to get the two away from the rooms, so she suggested that they go to the restaurant in the hotel for dinner. (Doc. 22 at 41).  In the elevator on the way to the restaurant Scott began rubbing Ms. Swyear's back, making her feel uncomfortable with his repeated unwelcome physical contact.  (Doc. 22 at 42).  Then when the elevator "mistakenly" stopped at the basement[12], rather than the floor where the restaurant was located, Scott frightened Ms. Swyear by attempting to guide her to a secluded portion of the hotel.  (Doc. 22 at 43).  When the two finally arrived at the restaurant Scott pulled Ms. Swyear's chair out for her as though they were not colleagues but rather on a date.  Scott was not respecting her repeated signaling that she was not romantically interested in him.  (Doc. 22 at 41-43; Def.'s Ex. A at 112).

On the way back to their rooms after dinner Scott noticed the hotel pool and asked Ms. Swyear if she wanted to swim with him.  (Doc. 22 at 45).  She replied by telling him that she had not brought a swimsuit with her.  (Doc. 22 at 45).  Scott retorted, "that's no problem," laughing at the suggestion that she could swim without a swimsuit that was couched in his response. (Doc. 22 at 45-46).

When the two were back at the rooms, Scott entered Ms. Swyear's room uninvited yet again.  (Doc. 22 at 48).  This time Ms. Swyear thought that if she went about her business Scott would get bored and leave.  Beginning to go about her business, Ms. Swyear sat on her bed and focused her attention onto her IPAD.  (Doc. 22 at 48-50).  Rather than accepting that Ms. Swyear was not paying attention to him, Scott crawled into the bed next to Ms. Swyear and pushed up against her, pretending to focus on her IPAD.  (Doc. 22 at 48-50).  Ms. Swyear abruptly shut the IPAD and told Scott that she was tired.  (Doc. 22 at 48-50).  Scott got off the bed and moved

---

[12] Plaintiff contends that Scott intended to stop in the secluded area as a way to isolate Plaintiff.  Further discovery is needed to understand Scott's motive for stopping and attempting to get off in the basement of the hotel.

toward the door to exit the room. Before reaching the door, he turned to Ms. Swyear and said, "well, if you decide to watch a movie I will be your cuddle buddy, I love to cuddle." (Doc. 46, Ex. D.) He then asked if she would come to his room to check the air conditioner. (Doc. 22 at 50-51)(Ex. D). Exhausted by the situation and eager to put it to an end she agreed, hoping that if she went to his room briefly that his repeated advances might stop once she left. (Doc. 22 at 50-51)(Ex. D). After checking his air conditioner and stating that there was nothing wrong and that it may take some time for the room to cool down, Scott asked her to sleep in the same bed with him, stating "what we ought to do is get the blankets from all four (4) beds and just sleep in one (1) [bed] together to stay warm." (Doc. 22 at 49-52). In addition to this being an odd comment given that Scott had been complaining about the rooms being too hot all evening, it made Ms. Swyear feel uncomfortable and she wanted more than anything to be far, far away. (Doc. 22 at 47-52).

    Ms. Swyear quickly exited Scott's room and entered her own, making sure to quickly close the door behind her. (Doc. 22 at 53). For the first time that night she was finally alone in her own room. (Doc. 22 at 53). She decided she would shower, and while she was in the shower Scott began calling her phone. (Doc. 22 at 53)(Doc. 46, Ex. D). When she did not answer he proceeded to begin banging on her door. (Doc. 22 at 53)(Doc. 46, Ex. D). Frightened by his persistence she exited the shower but left the water running so that he would think she was still showering. (Doc. 22 at 53). He continued knocking intermittently over the course of an hour, all the while she left the shower running. After an hour, she finally texted him that she was in the shower, which caused him to return to her door and begin banging again. (Doc. 22 at 53). After an hour and a half (1 ½) the banging finally stopped and Ms. Swyear went to sleep. The next

morning when she awoke she discovered that Scott had left the hotel at 4:00 a.m.; presumably to avoid the shame of facing her.    (Doc. 22 at 53-54).

After warding off Scott's repeated sexual advances Ms. Swyear was conflicted about what to do next.  All of her experience with Fare Foods was now cast in a new and intimidating light.  Porter's comments directly to her about not hiring women because he was afraid of their sexuality, his inquiring with her mother about Ms. Swyear's sex life, her being subjected to the role of cleaning up her male colleagues mistakes instead of doing the job for which she was hired, all of the discriminatory language used by Fare Foods employees to describe women and express their chauvinistic hostility toward women, Fare Foods' tendency to blame women for men's failure to control themselves, the knowledge of the Party Barn and how Fare Foods employees lauded Scott's sexual conquests there and longed for more, Williams directing her twice to "stay and hang" with the man whose sexual prowess was well known and celebrated, and now she had spent an entire evening and night fending off Scott's forceful, inappropriate, and persistent attempts to have sex with her.

Ms. Swyear wrestled with what to do for eight (8) days.  Then on the eighth (8th) day, after a routine meeting with Williams and Fare Foods' Administrative Supervisor, Scott Harsy ("Harsy"), she verbally reported the incident to Harsy, choosing to have faith that her employer would do the right thing.  (Doc. 22 ¶ 55)(Doc. 46, Ex. D).  Harsy replied with "O' god, that Russ" like the allegations carried no significance.  (Doc. 22 at 55).  Over the course of next twelve (12) days Ms. Swyear heard nothing about the report she made.  While she heard nothing about the investigation, Fare Foods found plenty of time to criticize Swyear's performance. (Doc. 24 at  62).  Finally, on August 4, 2015, Harsy requested Ms. Swyear put her complaint in writing, requesting it be completed by the end of the day.   (Doc. 22 ¶ 57)(Doc. 46 at 3).

After requesting the report from Ms. Swyear, Harsy and her supervisor, Williams, traveled together to Champaign, Illinois, to interview Scott regarding the allegations. (Doc. 46 at 3). During the interview Scott acknowledges (1) that an inappropriate comment was made in front of customer John Enright[13], (2) stating the room was "too cold" and stating "put all blankets together and sleep together," (3) and knocking on Ms. Swyear's door[14]. (Doc. 46, Ex. D). Scott disputes the amount of unwanted touching that occurred, and that it involved no flirting[15]. *Id.* Upon Harsy and Williams' return, Ms. Swyear informed Harsy that she did not feel comfortable writing her statement while she was at work due to the close proximity of her coworkers. (Doc. 22 at 58). Harsy informed her that she could write the statement that evening when she got home and then email it to him. (Doc. 22 ¶ 58).

Unfortunately, that evening Ms. Swyear developed an eye infection that prevented her from completing the report. (Doc. 22 ¶ 59). The next morning, Ms. Swyear notified Williams of the eye issue. *Id.* at 60. That afternoon, Williams inquired about the status of Ms. Swyear's eye, and she responded by informing him that it had gotten worse and that she was going to the emergency room. *Id.* at 60. The following day, August 6, 2015, Ms. Swyear again notified her supervisor that she needed to work from home and that she had an appointment that day to receive treatment from an eye specialist. *Id.* at 61. That same morning, Williams left a message on Ms. Swyear's phone for her to call the office, when she did she was told that she had been fired because "things were not working out". (Doc. 22 ¶ 60-62)(Doc. 46 at 4).

---

[13] Parties dispute who made the inappropriate comment. Parties also dispute who clarified the comment to remove any sexual innuendo. As such, summary judgment is improper.
[14] Scott's notes are vague as to the extent of the knocking. Again, another dispute of fact.
[15] Defendant must classify requests to sleep together a survival necessity in order to justify counting the unwanted comments as something other than flirting.

There is no dispute that employees referred to women as "Cunty" and "bitches". There is a dispute rather employees referred to women as "Big Tittie Blonde Carnies"16  Further, when taken in conjunction with Scott's actions at the hotel, as admitted by Scott, there can be no dispute that Defendant is not entitled to summary judgment as several disputes of fact and law remain.  When considering the facts most favorable to Plaintiff, the non-moving party, the Defendant's request for summary judgment is ill-advised and untimely as the trier of fact must decide the relevant disputes.  Therefore, summary judgment is improper and, thus, should be denied.

Reapplying *Galloway*, while considering *Cerros*, it is clear that this Court must review the allegations in the aggregate.  When doing so, it is clear that Plaintiff stated sufficient facts to survive summary judgment.  Therefore, the Court should deny Defendant's motion and compel the Defendant to complete discovery17.

II. <u>Defendant must answer for the retaliatory actions committed against the Ms. Swyear following the reporting of Scott's unwanted sexual advances.</u>

Next, Defendant argues that Ms. Swyear does not provide for a claim of retaliation.  In short, the Defendant argues that *no* reasonable person would find the sexual advances by Scott as harassment, and that, as such, no protected activity occurred.  Doc. 46 at 11.  Defendant further argues that no causal connection exists because timing is insufficient18.  *Id.*  Defendant claims that Plaintiff merely advocates on behalf of a short time period19.  *Id.*

---

16 Factual disputes are viewed in the light most favorable to the non-moving party.
17 Among other things, Plaintiff is aware that Defendant is withholding the Sales Manager's notes on the interview with Scott.
18 By not arguing otherwise, Defendant acknowledges that Plaintiff suffered an adverse employment action.
19 Defendant incorrectly lists the time period as June 22, 2015 through August 6, 2015.  Plaintiff reported the harassment on or about July 23, 2015.  Therefore, the correct timeframe for purposes of retaliation is July 23, 2015 through August 6, 2015.

Defendant relies on *Culver* (holding that a short period of time is rarely sufficient on its own to create a triable issue) and *Loudermilk* in support of its claims (holding that a mere suspicion is insufficient to survive summary judgment. Doc. 46 at 11-12. Although not discussed by the Defendant, *Loudermilk* also stands for the premise that "occasionally, an adverse action comes so close on the heels of a protected activity that an inference of causation is sensible. *Loudermilk v. Best Pallet Company, LLC*., 636 F.3d 312, 315 (7th Cir., 2011). The closer in time that two events occur, the more likely that the first event caused the second. *Id.* There, as pertinent here, the appellate court dismissed alleged legitimate business reasons for termination as *problematic* and required the company to defend "fishy" reasons for termination. *Id.* Ms. Swyear is entitled to the same from Fare Foods.

Until July 15, 2015, Ms. Swyear was a trainable employee who was merely three weeks into a new job. During the initial three weeks, Ms. Swyear met with Williams in order to gain constructive feedback on her integration into Fare Foods. Plaintiff received positive reassurances that she was developing appropriately. Plaintiff even met with Williams on July 23, 2015 to gain additional constructive feedback. Defendant's attempt to classify these as "performance issues" are extreme and unsupported by Defendant's actions and the conduct of other sales staff. Upon reporting the hotel incident, Swyear went from being a newly-hired trainable employee to being toxic. By all accounts, the Defendant wanted to end her employment from that moment going forward. The only thing different from July 22nd and July 24th was Swyear's protected activity. Given this, there is more than mere temporal proximation apparent.

Assuming, *arguendo,* that temporal causation is all Plaintiff relies upon, there is short enough time to create an inference of causation. Again, Defendant incorrectly applies

*Loudermilk*. There, the employer fired Loudermilk just twenty-four hours after Loudermilk violated a company policy and minutes after he complained about racial inequalities. *Id.* The employer defended the termination claiming it was due to the violation. *Id.* The court saw the violation as potential pre-text and overturned the lower court's granting of summary judgment. *Id.* Here, Fare Foods is attempting to play the same shell game. There is only two weeks between the protected activity and the termination. Furthermore, and directly on point with *Loudermilk*, the termination occurred less than forty-eight (48) hours after interviewing Scott. *Arguably¸* Fare Foods took this as a "he said/she said" between a long-standing employee and a new hire. Fare Foods reached this even after Scott admitted to many of the allegations. Rather than take steps to remedy the situation, Fare Foods fired Swyear for being a toxic asset. While the Court need not venture into the "what if," the question highlights the need for (1) this Court to deny summary judgment and (2) order Defendant to comply with Plaintiff's discovery requests.

   Applying *Loudermilk* and *Culver*, temporal causation is sufficient when within such a short period. Furthermore, Plaintiff's claims rely on more than mere temporal causation. Given this, summary judgment is improper and should be denied accordingly.

## CONCLUSION

   This Court should deny the Defendant's Motion for Summary Judgment; allowing Ms. Swyear to complete discovery. Defendant's motion is not supported by the law as (1) sexual harassment allegations are considered in the aggregate, not in isolation; and (2) there is sufficient evidence to establish harassment under the objective standard. Furthermore, Plaintiff establishes retaliation by more than mere temporal proximity even though temporal proximity is sufficient under the circumstances. Finally, there are sufficient factual disputes that, if determined, may

find for liability against the Defendant. In totality, summary judgment is inappropriate and should be denied accordingly.

  WHEREFORE, having stated sufficient grounds, Plaintiff requests this Court deny the Defendant's Motion for Summary Judgment and any other such relief that this Court deems just and proper.

               Respectfully submitted,

               KAUFHOLD & ASSOCIATES, P.C.


       By: */s/ Kevin C. Kaufhold*
          Kevin C. Kaufhold, # 6180295
          KAUFHOLD & ASSOCIATES, P.C.
          5111 West Main Street, Lower Level
          P.O. Box 23409
          Belleville, Illinois 62226
          Telephone: 618-235-3580
          Facsimile: 618-235-7150
          Attorney for Plaintiff

## CERTIFICATE OF SERVICE

   I hereby certify that on the 16th of <u>October</u>, <u>2017</u>, I caused the foregoing to be filed with the Court using the Court's ECF case management/filing system, thereby causing the foregoing to be served upon the following counsel of record:

Shari Rhode
Rhode & Jackson, PC
1405 West Main Street
Carbondale, IL 62901

              _____/s/ Kevin Kaufhold_____