**UNITED STATES DISTRICT COURT**
**FOR THE**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| AMY SWYEAR | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No.  3:16-CV-01214-SMY-RJD |
| v. | ) |
| | ) JURY TRIAL DEMANDED |
| FARE FOODS CORPORATION | ) |
| | ) |
| Defendant. | ) |
| | ) |

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S**</u>

<u>**MOTION FOR SUMMARY JUDGMENT**</u>

COMES NOW, Plaintiff Amy Swyear, by and through counsel Kaufhold and Associates P.C. and in support of her Motion for Summary Judgment.  Plaintiff hereby states as follows:

INTRODUCTION

Plaintiff Amy Swyear ("Swyear") alleges that Defendant Fare Foods ("Fare Foods" or "FF") subjected her to sexual discrimination, sexual harassment, and retaliation in violation of her rights as provided by Title VII of the Civil Rights Act of 1964.  42 U.S.C. § 2000e *et seq.* Swyear is entitled to summary judgment as Fare Foods (1) openly discriminating against females, (2) openly encourages or condones sexual harassment towards women, and (3) retaliated against Swyear for objecting to unwanted sexual advances made against her.

STATEMENT OF THE FACTS

By admission, FF provides concession products and equipment to customers across the eastern half of the United States.  Doc. 46, p. 1, § 3.  Operating from its Du Quoin, Illinois Headquarters (Ans., ¶ 5), FF serves food vendors at fairs and carnivals, as well as brick and mortar clients such as schools (Ex. 1. 19:16-20:01).

Ron Porter ("Porter") admittedly operated FF with the belief that women are genetically inferior to men; thereby requiring protection. Ex. 2, 57:10-24. Porter's beliefs create a very different work environment for males and females at FF. In terms of sales, females are assigned to inside sales (Ex. 1, 160:02-12), where they are given a set 8am-5pm daily schedule[1] (Ex. 1, 82:22-85:12). In contrast, males are assigned to outside sales (Ex. 1, 160:02-12) and sent out on the road (Ex. 1, 22:16-23:04). See also Ex. 3 (position requires 60% travel). FF alleges assigning women to outside sales. The allegation remains unsupported by documentation. Outside sales representatives ("OSR") develop their own schedules (Ex. 4, § 2(m)), develop their own sales routes (Ex. 4, §§ 2(f), 2(m)), develop their client base (Ex. 4, § 2(m), Ex. 21, p.2, ¶ 3), and work primarily on the road (Ex. 6). FF provides OSRs with vehicle, laptop, phone, lodging card, fuel card, and credit card. Ex. 5. While OSRs take orders as well, these duties are primarily completed during the first day or two of the six-day work week. Ex. 4, §§ 2(a-c). The remaining time is spent interacting and entertaining clients. In previous years, OSRs spent as much as 265 days traveling in a year[2]. Ex. 6, ¶ 14.

FF routinely makes gender-based decisions and later scrubs documentation detailing the discriminatory act. For instance, during the hiring process, Porter stated that Swyear would be the first female OSR. Ex. 7, 196:18-197:09. Porter liked the idea of hiring a female as they had the ability to manipulate men to do things for them. Ex. 2, 55:19-56:11. Later in the meeting, Porter expressed concerns on her ability to perform in a male-dominated field. Ex. 8, § 6. See also Ex. 1, 54:19-61:11 (Harsy recalls Porter making the statement, fails to excuse leaving off

---

[1] Porter denies OSR and ISR job titles. Ex. 2, 10:11-20. Company provided job descriptions discredit Porter's claim. Ex. 3; Ex. 21; Ex. 1, 22:16-23:04.

[2] HR notes provide that OSR Scott spent 250+ days on the road. Ex. 6. This is consistent with Harsy's statement to Swyear that the position requires traveling 60% of the time. Ex. 7, 29:05-23. See also Ex. 16.

typed notes).  Human Resources Director Scott Harsy ("Harsy") documented the statement during the meeting, and later removed it from the typed version.  Ex. 9.

In another instance during hiring, while meeting with Swyear, Sales Manager Robert Williams ("Williams") discussed the inappropriate behavior of other OSRs, both males.  Ex. 7, 49:16-51:06.  Williams disregarded Swyear's attempts to resolve the salary difference.  *Id.* 52:01-23.  Instead, Williams describes unprofessional behavior, excessive drinking, and going as far as sleeping on the customer couches[3].  *Id.* 49:16-51:06.

Porter's discriminatory beliefs continued once hiring Swyear.  From the start, Porter instituted travel restrictions for Swyear.  While most OSRs planned their owned travel routes with limited input from Porter and Williams (Ex. 4, §§ 2(f), 2(m)), Porter and Williams planned Swyear's routes extensively.  Ex. 8, § 8, See also Ex. 7, 202:24-203:14.  The two specifically outlined who Swyear could meet and when she was to meet them.  Ex. 8, § 8.  When Swyear failed to reach a destination at the exact time, Williams or Porter scolded for her tardiness[4].  *Id.* at p. 3.  FF reliance on GPS is flawed as credit card receipts depict disparities of Swyear's locations at specific times, some as much as ninety (90) minutes.[5]

Furthermore, Williams required Swyear to stay exclusively with inside sales when not specifically traveling; even going to the extreme of keeping Swyear on the same 8am-5pm schedule that the other sales women had.  Ex. 11.  Furthermore, FF denied issuing Swyear a credit card to entertain clients.

---

[3] While complaining about the behavior, the OSRs faced no discipline from the company and, in fact, continued to work for FF for over a year after Swyear's termination.

[4] FF claims this is due to having frozen products that face spoliation during transport.  FF provides no specifics of any customer complaints or product spoliation in support of its defense; rather relying on general denial.

[5] When comparing fuel card purchases and GPS data, locations between the two do not line up.  In one instance, the disparity is 90 minutes.  Ex. 27 & Ex. 33.  This questions FF reliance on the data.

Office staff routinely ridiculed any individual who displayed perceived female-like inferior characteristics.  For instance, staff nicknamed a female customer "cunty" due to her presenting nature.  Ex. 2, 30:24-32:23.  See also Ex. 23, p. 9, ¶ 1 (FF states client received nickname for being unpleasant).  Swyear learned of the nickname during her first sales meeting, attended by Porter and Williams.  Ex. 7, 81:04-22 & 84:21-86:07.  Porter confirms being aware of the name during the last six years and using it himself.  Ex. 2, 30:24-32:23.   When Swyear questioned where the name came from, an employee stated that the client is "just a bitch."  Ex. 7, 81:04-22.  In another instance, while Williams gave Swyear a tour of the facility, a male warehouse worker warned her about coming out of the freezer with erect nipples or face constant ridicule from other employees.  Ex. 7, 209:10-210:07.  Williams did nothing to address the comment.  *Id.*  Later on the tour, Williams introduced her to two male employees; one nicknamed "Nips" (Ex. 7, 80:14-81:03), the other nicknamed "Bitchy Ritchie" (*Id.,* 80:03-13).  No one explained the origination of the names to Plaintiff.

During Swyear's training, Porter, Williams and the inside sales staff routinely discussed the continued inappropriate behavior of OSR Russ Scott ("Scott").  Ex. 7, 82:15-83:13, 84:14-17, 84:19-20, 84:21-86:07, 172:03-173:12.  The staff laughed at his exploits and ridiculed his sexual conquests.  *Id.*  Conversations occurred continuously throughout Swyear's six (6) weeks of employment.  Ex. 7, 84:14-20.  Porter participated in at least a half-dozen of these conversations.  Ex. 7, 76:10-80:01.  Williams turned a deaf ear; at times literally, by plugging his ears while walking into a conversation and singing "la la la".  Ex. 7, 82:15-83:04.  Swyear approached Williams during the first few weeks of employment to discuss the hostile tones, Williams disregarded the complaint as if to say it is what it is.  Ex. 7, 86:19-88:10.

Sadly, it was a FF employee that reaffirmed Porter's belief that women's genetics created vulnerabilities while on the road.  On July 15, 2015, Porter instructed Scott to meet up with Swyear to conduct some midway training.  Ex. 2, 74:24-75:04.  Towards the end of the workday and throughout the evening, Scott made repeated unwanted advances to Swyear.  In one interaction with a client, Scott insinuated the two were going to get a room together.  Ex. 7, 96:09-22.  The client, John Enright ("Enright"), and Swyear were both caught off-guard by Scott's statement; Enright replying, "that's none of my business", while Swyear quickly refuted saying that they were getting separate rooms.[6]  *Id.*

When Scott and Swyear arrived at the hotel, Scott spent the evening as if they were on a date; making numerous unwanted physical contacts (Ex. 7, 116:08-117:09), pushing up close to Swyear (Ex. 7, 102:22-103:13), pulling out chairs (Ex. 7, 112:05-113:02), numerously conveying that he was single (*Id.*).  Scott propositioned Swyear no less than three separate times to get intimate: (1) asked her to take a naked swim with him in the hotel pool[7] (Ex. 7 115:23-116:06), (2) asked her to push beds together and sleep together[8] (Ex. 1, 132:06-23), (3) and asked her to be cuddle buddies because he likes to cuddle[9] (Ex. 1, 132:24-133:19).  Additionally, Scott spent the evening finding little ways to enter Swyear's room.  Ex. 7, 107:04-07, 118:13-22, 118:24-119:15, 120:12-121:06.  When Swyear told Scott that she was taking a shower and going to bed, Scott knocked on the door at least three more times and called her as a last-ditch effort to complete his conquest.  Ex. 7, 120:12-121:06.  Scott's actions caused Swyear to become frightened and lock herself in her room.  *Id.*  After exiting the shower, Swyear left it running for

---

[6] Scott claims that Enright made the inappropriate comment.  Ex. 18.  FF did not interview Enright to resolve the fact dispute and failed to provide contact information to Plaintiff.  Ex. 1, 117:09-13.

[7] Swyear's testimony is undisputed.

[8] Scott confirmed to Harsy (verbally twice, once in writing) that he made the statement.

[9] Scott confirmed to Harsy (verbally twice) that he made statement.  Harsy failed to document testimony in notes.

an additional hour to convince Scott that she was still in it. *Id.* The stress of the incident led her to develop an eye infection the following morning.

Swyear took a few days to come to terms with the incident before deciding to report it. After a performance meeting with Williams and Harsy (Ex. 11), Swyear went to Harsy to report the incident (Ex. 17). Harsy documented Swyear's verbal complaint[10]. *Id.* Harsy called Scott either that day or the next to discuss the allegations. Ex. 1, 114:24-115:09. Scott confirmed most of the details, including asking Swyear to sleep together and asking to be cuddle buddies[11]. Ex. 18, 132:06-133:19. Either July 23 or July 24, following the call with Scott, Harsy met with Porter and Williams to discuss the allegations. Ex. 1, 122:04-12[12]. Porter and Harsy mutually agreed that no discipline was warranted. Ex. 2, 82:01; Ex.1, 180:06-10. Rather, Porter prevented the two from meeting on road. Ex. 2, 81:04-15. To achieve this, FF stopped Swyear from traveling entirely. Ex. 7, 161:14-18.

Swyear repeatedly met with Williams to discuss scheduling travel to various fairs throughout the region. Ex. 7, 189:14-190:16. Williams stated that he needed to discuss with Porter, and never provided any follow-up. Ex. 7, 193:03-16. Presumptively, that insinuates that Porter denied all requests for Swyear to travel. When Swyear started visiting local clients, FF took her company van[13]. Ex. 7, 194:09-195:09; See also Ex. 19. As weeks went on, relations became increasingly strained, with Porter verbally accosting Swyear in front of numerous employees; cursing her out. Ex. 7, 183:02-185:11.

---

[10] FF failed to provide the handwritten notes. Rather, providing only the typed version. It is unknown if there are any discrepancies between them.

[11] Harsy testified that he made notes of conversation. Ex. 1, 112:09-21. To date, FF has not provided them.

[12] Porter claims not to know about the event until 10 days after the complaint. Ex. 2, 77:23-78:17. This is not supported by Harsy's claim as the company stopped Swyear from traveling immediately following the complaint.

[13] FF previously defended claim by stating that it sold only to carnivals, not non-carnivals such as gyms. Harsy later discredits that statement by testifying that FF sold to school and other establishments. Ex. 1, 19:16-20:01.

On August 3, 2015, Williams and Harsy met with Swyear[14]. Ex. 19. Williams opened the meeting by putting Swyear on a thirty (30) day performance improvement plan[15]. Ex. 19, ¶ 1. Swyear questioned Williams how he planned her travel for the upcoming weeks, Williams again deflected stating they will take it day by day. Ex. 7, 193:21-194:05; Ex. 19, p. 2, § 9; p. 6, § 7. Swyear questioned the discussions about her work asking if they think she is not working. Ex. 6, § 1. At this point, it was clear that FF considered her a toxic asset and was preparing for her termination.

The following day, August 4, 2015, Porter instructed Harsy and Williams to get written statements from Scott and Swyear regarding the events on July 15, 2015[16]. Harsy met with Swyear and requested her written statement by the end of the day. Ex. 7, 133:12-23. Harsy and Williams then drove to Champaign, Illinois to meet personally with Scott. Ex. 1, 126:22-127:07. During the interview, Scott confirmed asking to sleep together (Ex. 1, 132:06-23) and to be cuddle buddies[17] (Ex. 1, 132:24-133:19). Scott denied the comments to Enright (Ex. 1, 131:10-132:05; Ex. 18, p. 1, §§ 2-3) and denied any unwanted touching (Ex. 18, p. 2, § 3). Scott also confirms and denies aspects regarding the phone calls and text messages between the two at the end of the evening. Ex. 18, p. 1, § 7. Williams took pictures of the text messages[18]. Ex. 18, p. 2, § 6.

Either on the way back from Champaign or the following morning, Williams called Porter to discuss Scott's statement. Ex. 2, 108:04-109:06. Again, Porter believed that no discipline is warranted. Ex. 2, 82:01-07. The phone conversation shifted to terminating Swyear.

---

[14] Harsy and Williams each documented the discussion. Ex. 10, Ex. 19. The notes do not match.
[15] Plaintiff is unaware of plan but does recall the meeting.
[16] Porter denies claim. Porter states that Harsy requested to get statements. Ex. 2, 96:09-98:03.
[17] Harsy confirms this during deposition. Ex. 1, 132:24-133:19. However, Harsy's notes do not address the cuddle buddy comments.
[18] FF failed to provide the messages.

Ex. 2, 108:04-109:06.  Porter approved Williams request to terminate Swyear.  Ex. 108:04-

109:06.  Harsy cancelled Swyear's fuel card the following morning, August 5, 2015.  Ex. 1,

101:14-103:16; Ex. 20.

Swyear developed another eye infection while attempting to recount the events in the

hotel.  Ex. 7, 134:15-18; 138-141:12.  As such, Swyear called in sick on August 5, 2015 and

August 6, 2015.  Ex. 7, 138:01-139:11. On August 6, 2015, when returning a call from Williams,

Williams terminated Swyear over the phone.  When pressed for reasons, Williams just said "it

wasn't working out"[19]. 138:01-139:11.

LAW

Courts grant summary judgment when there is no dispute of material fact and the movant

is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Spurling v. C&M Fine Pack,*

*Inc.,* 739 F.3d 1055, 1060 (7th Cir., 2014).  Courts consider all facts in the light most favorable to

the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

I.    Summary judgment for Count I is proper as FF dictated Swyear's terms of
      employment based upon Porter's belief that females are genetic inferior.

Here, Plaintiff is entitled to summary judgment as (1) she was subjected to unwelcome

harassment, (2) based on her gender, (3) the harassment was sufficiently severe or pervasive so

as to alter the condition of employment and create a hostile or abusive environment, and, (4)

there is a basis for employer liability.  *Boumehdi v. Plastic Holdings, LLC,* 489 F.3d 781, 787

(7th Cir., 2007).  Plaintiff combines the elements one and two for efficiency.

Courts evaluating sexual harassment claims look at the totality of circumstances (*Clark*

*County School Dist. v. Breeden* 532 U.S. 268, 270-71 (2001)); as typically, sexual harassment is

cumulative (*Galloway v. General Motors Service Parts Operations*, 78 F.3d 1164, 1166 (7th

---

[19] Harsy sat in on call and took notes.

Cir., 2005)).  Harassing conduct that is circumstantially related or temporally linked are considered a single course of conduct (*Id.*), as there are no specified number of events needed to establish a claim (*Cerros v. Steel Technologies, Inc*., 398 F.3d 944, 950 (7th Cir., 2005)).  A company's environment perceived as hostile and abusive is actionable under Title VII. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993).

    A.  <u>Sexual harassment developed from FF's belief that women are genetically inferior and require protection.</u>

There is no question that Swyear faced discriminatory treatment.  First, prior to starting, FF used Swyear's gender as hurdles to employment multiple times: (1) Porter asked if she could perform in male-dominated field, (2) Porter expressed beliefs that women could manipulate males to unload trucks, (3) Williams required Swyear to address behavioral concerns that, based upon the lack of discipline, is only an issue when females act that way.

Second, FF extended the gender hurdles by creating barriers for Swyear to perform. Porter believed that women were basically potential victims requiring protection due to genetic inferiority.  FF refused to give Swyear the same schedule, tools, and discretion to use professional judgment.  Male OSRs made their travel plans, daily schedules, developed client meetings.  FF gave so much discretion that the company lost track of where the OSRs were located. Ex. 6, 31, & 32.  Alternatively, Porter required to know where Swyear was and who she was speaking to.  Additionally, with Swyear, FF restricted her to the office to act as data entry, restricted her schedule to be the same as the other office women, and specifically denied her attempts to develop customers.  These terms of employment expressly contradict the intent of both parties as expressed at the June 18, 2015 meeting.  Both parties expected Swyear to travel, making new clients.

Third, FF fostered a hostile environment.  Here, the conduct began day one and continued routinely throughout the course of Swyear's employment.  Employees used terms such as "Cunty", "Bitch", "Nips", and "Bitchy Ritchie" to describe customers and fellow employees.  Not only did Williams and Porter actively hear and/or participate in the discussions[20], Swyear approached Williams to discuss the hostile nature of the environment.  Williams dismissed the complaint as being something that he could not change.

While FF claims that "Bitchy Ritchie" embraced the name (Ex. 2, 28:14-30:05), "Nips" displayed obvious embarrassment when introduced to Swyear (Ex. 5, 80:14-81:03).  FF provides that "Nips" received nickname due to habit of rubbing his nipples when nervous.  Ex. 23, p. 9, ¶ 1.  Harsy explains that "Bitchy Ritchie" received it for having negative (147:22-149:07).  During discovery, Porter details that employees used the name "Bitchie Ritchie" for several years.  Ex. 2, 28:14-30:05.  Regardless of origination, Plaintiff had no reason to know that these names did not contain blatant sexist overtones.

Finally, Scott's unwanted sexual advances and Swyear's subsequent complaint led to additional discriminatory treatment.  Swyear's complaint reaffirmed Porter's victim mentality towards women.  As a result, due to Swyear being a victim, Porter found it unsafe to send her back out on the road.  Rather, Porter blocked Swyear's attempts at travel and Williams scolded her for attempting to make local contacts.  FF felt the best way to protect from future harassment was to deny Swyear the ability to perform her job.

Comments by Porter and conduct by FF management necessary imply that Swyear faced this conduct due to her gender.  Again, Porter's belief that women are genetically inferior is irrefutably gender based.  Porter's concerns about Swyear performing in a male-dominated field

---

[20] On at least one occasion, Williams stuck fingers in his ears in order to pretend to be oblivious to the topic of conversation.

are also irrefutable.  These comments provide the basis for the remaining conduct by FF management.  The separation of positions between male and females; treating Swyear the same as the females, rather than like her fellow OSRs, were again gender based.

Swyear's lack of a "Y" chromosome also explains why FF blocked issuance of a credit card to Swyear.  FF admits not issuing the card (Ex. 12), but defends it due to a company-wide eight (8) week policy not to issue credits cards to new employees.  Ex. 1, 49:06-51:24.  FF admits that there is no written policy (Ex. 1, 53:14-54:07), nor did it write it into the employment agreement (Ex. 5).  Furthermore, FF routinely issued cards to male employees within the eight weeks even when that employee did little to no travel. See Ex. 13 & 14 (Williams receives credit card two weeks after starting).  See also Ex. 15 (Harsy receives credit card less than two weeks after starting despite little to no travel requirements).  Given this, the policy is a shame and only applied to Swyear.

B. The hostile environment was severe enough to alter the conditions of employment.

Given this, the claim hinges on the severe and pervasiveness of the conduct and whether it creates a hostile or abusive environment. *Boumehdi v. Plastic Holdings, LLC*, 489 F.3d 781, 787 (7th Cir., 2007).  Courts look at the subjective and objective nature of the conduct to determine the severity.  *Id*. at 788.  Swyear's complaints are sufficient to establish the subjective hostility.  *Id*.  Furthermore, objective severity is based on the totality of the circumstances.  *Clark Cty Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001).  Conduct circumstantially related and in close temporal proximity are considered a single course of conduct. *Galloway*, 78 F.3d at 1166.

FF's conduct is easily a single course of conducts.  First, this entire sequence revolves are approximately six-ten (6-10) weeks.  Swyear's employment lasted from June 22-August 6, 2015; a mere six weeks.  The remaining conduct occurred in the few weeks prior to Swyear starting.

First and foremost, Conduct included Williams and Porter's gender based conversations. This continued when she started her employment as Swyear did not receive the same tools and discretion to complete her job as her male counterparts. Rather, FF relegated her to being an inside female, where they could protect her. Finally, Swyear faced constant exposure to an environment that belittled women.

FF defends the derogatory language be providing that it applied equally to men and women. *Galloway* controls here. It provides that ambiguous derogatory terms become unambiguous based upon context, and use of terms such as "dumb broads" and "cunts" are inherently sexual. *Galloway*, 78 F.3d at 1166, 1168. Here, we have both inherent sexual comments such as "Cunty" and ambiguous comments such as "bitch", "Nips", and "Bitchy Ritchie". Looking at context, FF employees justify calling a female client "Cunty" is because she is a "bitch" and unpleasant. This context provides that "bitch" adopts the inherently sexual natural provided by "Cunty".

Turning to "Nips" and "Bitchie Richie", these comments are used on men. These terms do not carry the same protections given this, unless the use is tied to less desirable female traits. "Nips" received the nickname due to walking around with erect nipples, due to a nervous habit of rubbing them. Presumptively, employees gave "Nips" his nickname as he displayed genetically inferior traits just as women do. Similarly, "Bitchie Ritchie" received his nickname for having a negative outlook on life. This does not necessarily relate to the use of "bitch" or "cunty", which thereby negates FF argument that men and women received equal treatment.

FF openly discriminated against Swyear due to her "genetic inferiority". FF employed illegitimate gender-based pre-employment hurdles and gender-based performance barriers. FF fostered a hostile environment, designed to maintain male superiority. Finally, FF doubled-down

on its inferiority complex by taking extreme protectionist measures upon Swyear's complaint about Scott's conduct.  Together, the conduct created a hostile environment that objectively alter the terms and conditions of employment.  Therefore, this Court should grant summary judgment.

Here, Porter and Williams openly discriminated against Swyear over the course of her employment.  Forcing her to pass gender-based hurdles to employment, imposing gender-based duties and restrictions, and using gender-based derogatory terms.  Additionally, Porter and Williams were aware of multiple acts of discrimination occurring and failed to take remedial measures.  First, both were aware of employees using gender-based derogatory terms on employees and customers.  Second, Williams witness warehouse employees warn Swyear that she faced ridicule for having erect nipples.  Third, Williams and Porter felt that admitted, unwanted sexual advances were insufficient to warrant discipline for the harasser.  Rather, FF disciplined the victim by denying all travel going forward.  Together, the conduct created a hostile environment that objectively alter the terms and conditions of employment.  Therefore, this Court should grant summary judgment.

II.     Summary judgment is proper for Count II as FF admits subjecting Plaintiff to sexual harassment, and, then fail to remedy the conduct.

Additionally, an employee may establish a claim of discrimination under either the direct or indirect method.  *Wyinger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir., 2004).  The burden shifting method requires the employee to establish a prima facie case by showing that (1) she is a member of a protected class, (2) she was performing her job satisfactory, (3) she suffered an adverse employment action; and (4) at least one similarly situated employee received more favorable treatment.  *Id.*

Here, Defendant's admissions provide the basis for summary judgment in Plaintiff's favor.  Defendant admits that (1) employees refer to each other and clients with sexually

suggestive terms such as "Cunty" and "Nips", and (2) Scott made numerous unwanted to sexual advances to Swyear while working.  Furthermore, Defendant fails to rebut Plaintiff's allegations that male employees harassed females for their erect nipples or Scott's reference to a client as "Big Tittie Blonde Carnie".

Furthermore, Defendant maintained an environment that fostered the sexual exploits of Swyear's harasser.  Prior to his attempts at her, Swyear spent weeks listening to coworkers, along with Porter and Williams discuss Scott's sexual exploits.  From there, Porter put Swyear on a platter for Scott to make his attempts to sleep with her.  While Porter states that he was nearby, gas receipts put him across the state.  Ex. 27.  Furthermore, Swyear testified that Scott stated he was in route from Indiana.  Ex. 7, 91:03-07.  Given this, it is unlikely that he was nearby.

Plaintiff argues elements two through four (2-4) under Count III and, therefore, incorporates them by reference.

III.    Plaintiff is entitled to summary judgment on Count III as Fare Foods retaliated against Plaintiff by reassigning her to inside sales, taking the tools necessary to complete her duties, and terminating her employment; thereby entitling Plaintiff to Summary Judgment.
Plaintiff establishes a claim for retaliation upon either the direct or indirect methods.

*Moultrie v. Penn Alum. Int'l,* 766 F.3d 747, 755 (7th Cir., 2014).  The indirect method requires the plaintiff show that she (1) engaged in a protected activity, (2) met her employer's legitimate expectations, (3) suffered an adverse employment action, and (4) was treated less favorably than similarly situated employees who did not engage in protected activity.  *Id.*

Mere temporal proximity is typically insufficient.  *Wyinger*, 361 F.3d at 981.  However, *occasionally*, an adverse action comes so close on the heels of the protected activity that an inference of causation is sensible.  *Loudermilk v. Best Pallet Company, LLC.*, 636 F.3d 312, 315

(7th Cir., 2011).  The closer in time that two events occur, the more likely that the first event caused the second.  *Id.*  The plaintiff establishes pretext by highlighting flagrant inaccuracies or inconsistencies in an employer's proffered reasons for the adverse employment action.  *Baker v. Macon Resources, Inc.*, 750 F.3d 674, 677 (7th Cir., 2014).

A. Swyear complained about harassment and, therefore, engaged in protected activity.

Swyear complained to Harsy on July 23, 2015 that she was subjected to unwanted sexual advances by her coworker.  Harsy confirms the meeting and Swyear's account.  Harsy also testified that he believed Swyear's complaint to be consistent with the complaint procedures outlined within the employee handbook.  Ex. 1, 111:15-112:08.  This is sufficient to establish protected activity.  FF attempts to downplay this by stating that Swyear did not categorize the events on July 15 as harassment, rather she stated that she was uncomfortable.  The argument is illogical.  First, Swyear describes numerous unwanted *sexual* advances.  This necessarily infers sexual harassment.  Second, when asked to define sexual harassment, Swyear defined it as an uncomfortable environment caused by sexual undertones.  Ex. 7, 173:13-174:07. Given this, FF cannot rely on this misguided claim.

FF does not dispute taking adverse employment actions against Swyear.  FF admits to stopping Swyear's travel, reassigning her to inside sales, disciplining her for failing to conform to the new position, and terminating her employment.

B. FF's expectations were based on discriminatory motives, are filled with inaccuracies and, therefore, lack legitimacy.

FF defends the adverse actions by stating that Swyear failed to perform adequately and, therefore, legitimate business reasons warranted the adverse actions.  First off, as noted above, FF implemented gender-based expectations on Swyear from the start of her employment.  FF expected Swyear to perform as an ISR, while accomplishing the objectives of an OSR.  FF

provided where she went and who she spoke to.  Any variation was insubordinate and grounds for discipline.  Given this, FF arguments of poor performance have no legitimacy.

Additionally, questions regarding the performance complaints raised by FF.  Additional questions revolve around the authenticity of Williams's meeting notes create serious credibility issues for FF.  Ex. 10.  Given the number of inaccuracies, the inference becomes that FF created the document to defend against Swyear's claims.  This document is simply titled "Amy Swyear Issues".  *Id.*  Harsy testifies that this document was drafted by Williams prior to his departure from FF, and FF submitted the document to IDHR in defense of Swyear's state-based claims.  Ex. 1, 75:15-82:21[21].

The first event occurs on June 15, 2015; Williams states that Swyear arrived late to a delivery in Tennessee.  Ex. 10.  Swyear did not start her employment until June 22, 2015; therefore, this claim is wholly false.  The second event occurred on June 16, 2015.  *Id.*  Williams details Swyear is off track and remains at her hotel at 12:30 pm.  *Id.*  Again, this event occurred nearly a week prior to Swyear starting employment.  Furthermore, FF provided GPS records beginning on July 1, 2015.  Presumptively, this is the first day which Swyear traveled with a company vehicle.  If not, FF is intentionally withholding the additional records[22].

The third event occurs on Sunday, June 28, 2015 at Fair St. Louis.  However, Fair St. Louis started on Thursday, July 2, 2015.[23]  Williams details an incident that occurred five days before the fair started.  Furthermore, it is well documented that Sunday's at FF are reserved for

---

[21] Plaintiff introduces the exhibit for purposes of impeachment.

[22] FF previously alleged the date discrepancy is due to a typo and should be July 15 & 16, respectively.  Ex. 28, p.2, footnote 1.  However, the July 15 note details a stop in Tennessee.  This is the same night as the hotel incident in Iowa.  Swyear cannot be in a hotel in Tennessee and Iowa simultaneously.  This further infers the presumption that the notes are fabricated to show poor performance.

[23] Plaintiff requests the Court take judicial notice of online newspaper article detailing 2015 Fair St. Louis Schedule.  The Post-Dispatch Article, dated July 2, 2015, details a start date of July 2, 2015.  Website: http://www.stltoday.com/entertainment/music/fair-st-louis-schedule/article_b2b74026-59a6-57aa-b686-9b61af16717c.html

calling customers.  Ex. 10.  The fourth and fifth events detailed occurred on July 14th.  The first

entry focuses on a lost wallet.  Swyear does not dispute that she forgot her wallet.  The second

entry details Swyear going to Crescent City to see her mother.  Ex. 10.  Ex. 29, 21:06-22:04.

This entry is flawed multiple times.  First, Swyear did not go to Crescent City until July 16, the

day following the hotel incident.  Ex. 29, 21:06-22:04.  Second, Williams scolds her for visiting

her mother even after noting that she received clearance before doing it.  Ex. 10.  Third, the stop

caused no delays as Crescent City was a previously scheduled stop.  Ex. 29, 21:06-22:04.  While

Williams alleges that Swyear failed to leave before 2pm the following day, presumptively the

17th, FF withheld the GPS data detailing her whereabouts.  Given this, FF refused to produce the

only evidence that supports or denies the competing assertions.

Harsy and Williams provide notes for a performance meeting on July 23, 2015, occurring

moments prior to Swyear's allegations against Scott.  Ex. 11 & 10, respectively.  The

conversation focused on Swyear's responsibilities to provide information to Williams while out

on the road.  Ex. 11.  Additionally, Williams wanted Swyear to focus on gaining product

knowledge in order to better focus client conversations.  Ex. 11.  Williams also noted that

Swyear must arrive to the office by 8 am.  Ex. 11.  While FF provides this to be disciplinary in

nature, Swyear took this as a standard new hire performance review.  Ex. 7, 164:23-165:20.  It is

evident by the continued conversations about road travel that Williams, and FF by extension,

intended to send Swyear back out.  However, following her report, FF never did.

On July 30, 2015, Williams details tracking Swyear's GPS as she made local runs for

delivery.  Ex. 10.  FF provides no GPS data for that date.  Instead, FF does provide GPS data for

July 31, 2015.  Ex. 30.  Again, FF addresses nothing regarding the discrepancies.  Additionally,

Williams notes provide multiple meetings with Swyear between July 30 and the second August 3

meeting.  Ex. 10.  This raises the necessary question, why did Williams not address the issue prior to the second August 3rd meeting, attended by Harsy.  On this date, Swyear visited non-primary customers as instructed by the owner's son.  FF denies selling to anyone other than carnivals.  This claim is refuted by Harsy who details a significant customer base being schools.  Given this, FF reliance is flawed and should not be given weight.

Finally, Swyear met with Williams twice on August 3, 2015.  The first meeting addressed follow up calls.  The second meeting involved Harsy.  In that meeting, according to Harsy's notes, Williams put Swyear on thirty (30) day plan[24].  Additionally. Williams took Swyear's company vehicle; later stating that travel would be determined day by day.  When question about it, Porter stated that Williams acted unilaterally by putting Swyear on the plan.  Ex. 2, 93:04-95:21.  Given this, it is unfathomable why Williams left the biggest part of the meeting out of the note.

Instead, Williams focused on Swyear's use of the company vehicle.  Swyear, admittedly, misunderstood Williams when he stated that the van was for business use only.  Swyear took that to mean that she could not make personal stops while on the road.  Given this, Swyear drove the company van home from work, as she had done since she started.  Williams called her to return the vehicle and for not following directions.

The competing notes create several inferences.  First, presumably Williams created the document to substantiate his request to terminate Swyear.  Doing so, given the inaccuracies, there is an inference that Williams fabricated several instances of Swyear's poor performance and insubordination.  FF's reliance on the documents further perpetuates the falsification.  It's clear that Williams and Porter discussed Swyear's future with the company within twenty-four

---

[24] Harsy's notes detail the 30-day plan, while Williams notes are silent.

hours of getting written confirmation from Scott.  Ex. 2, 108:04-109:06, 107:20-108:01. Again, this is inquisitive given that Porter and Harsy considered the matter closed and no discipline was warranted on July 24, 2015.   Williams requested to terminate Swyear, and Porter granted it. This is sufficient to establish retaliatory conduct under false pretext.  Given this, summary judgment is warranted and should be granted by this Court.

Confusion remains on why to get the August 4th statements.  Porter and Harsy disagree on whose idea it was to conduct the interview[25].  Given this, it is equally plausible that FF intended to get the statements to contest any potential claims by Swyear.  Again, Harsy's testimony details changes in Scott's verbal statement on July 23 and the written statement on August 3.  Furthermore, Harsy admits to leaving crucial details out of the August 3 notes. Finally, Harsy admits documenting the phone conversation but mysteriously losing it.  Given the numerous inaccuracies, FF holds no credibility and summary judgment is proper.

C.   FF terminated Swyear for conduct less severe than her male counterparts.

Finally, Swyear's performance mirrored her colleagues and, therefore, provides no basis for termination.  FF employed two other OSRs during this time; Bob Prince and Russell Scott. Scott is the individual who (1) harassed Swyear in the hotel, (2) fell asleep on customer's couches, and (3) called a client "Typical Big Tittie Blonde Carnie".  Additionally, by reviewing various human resources notes, several performance issues appear: failed to process orders, argued with ownership on the duties of outside sales, argued with sales manager, failed to provide measurable productivity, failed to visit clients, stayed onsite too long, and drove across country on company time to not do company work.

---

[25] Porter states that Harsy requested the interview.  Harsy states he was instructed by Porter.

Prince was equally appealing as previous notes highlight.  The short recap is: little to no none productivity, always late, failed to contact clients, made inappropriate comments in office, and generally just caused problems for office staff.  Yet, despite these issues, FF continued to employ both OSRs with little to no discipline.  Given that Swyear met and, likely, exceeded productivity of similarly situated male OSRs, FF performance excuse is merely pretext and should not be considered by this Court.

Plain and simple, FF retaliated against Swyear for not being a victim.  Swyear made a good faith complaint, asking that she not travel with Scott anymore.  FF took that request to an extreme by stopping her from performing her job.  FF used discriminatory expectations to terminate Swyear when she refused to conform to the new position.  When faced with litigation, FF fabricated reasons to justify the termination.  Given this, summary judgment is warranted and should be granted by the Court.

## CONCLUSION

FF fostered a sexually discriminatory environment and then retaliated against a female employee who refused to be a silent victim.  Given this, this Court should grant Plaintiff's Motion for Summary Judgment.

KAUFHOLD & ASSOCIATES, P.C.


By:_____/s/ Doug Stewart_____
        Doug Stewart, MO #70374
        5111 West Main Street
        P.O. Box 23409
        Belleville, Illinois 62226-0409
        (618) 235-3580
        Attorneys for Plaintiff

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 19th day of <u>January 2018</u>, I caused the foregoing to be filed with the Court using the Court's ECF case management/filing system, thereby causing the foregoing to be served upon the counsel of record:

Shari Rhode
Rhode Law
1405 West Main Street
Carbondale, IL 62901

*/s/ Doug Stewart*