IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| AMY SWYEAR, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Case No. 16-CV-1214-SMY-RJD |
| FARE FOODS CORPORATION, | ) ) ) |
| Defendant. | ) |

# MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiff Amy Swyear, a former employee of Defendant Fare Foods Corporation, filed this action alleging sexual discrimination, sexual harassment, and retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*. Fare Foods has moved for summary judgment (Doc. 46). Swyear has also moved for summary judgment (Doc. 52). Both parties filed responses (Docs. 47 and 54). For the following reasons, Fare Food's motion is **GRANTED** and Swyear's motion is **DENIED**.

## Background

Fare Foods provides concession products and equipment to the concessionaire industry as well as brick and mortar clients such as schools (Doc. 52-2, pp. 19-20). It is owned by Ron and Laura Porter and is headquartered in Du Quoin, Illinois (Doc. 52-2, p. 18). On June 18, 2015, Plaintiff Amy Swyear accepted an offer of at-will employment with Fare Foods as an Outside Sales Representative ("OSR"). She began working as an OSR on June 22, 2015. Plaintiff worked for Fare Foods for approximately six weeks before her termination (Doc. 46-1, p. 84).

At the time Swyear was hired, Fare Foods employed three Inside Sales Representatives ("ISRs") and three OSRs (Doc. 52-2, pp. 159-160). Both ISRs and OSRs were sales employees. ISRs serviced clients mostly from the home office, while OSRs traveled to various locations within the Midwest to serve Fare Food clients at fairs and conventions (Doc. 52-2, p. 57). Robert Williams was the supervisor of both ISRs and OSRs (Doc. 52-2, p. 76). The senior sales staff member was an ISR and was responsible for training all sales employees – both OSRs and ISRs. *Id*. at p. 57. While being trained, OSRs were expected to work regular hours like the ISRs. *Id*. at p. 85.

Swyear was not the first woman hired as an OSR (Doc. 52-2, p. 159). However, she was the only female OSR during her time at Fare Foods. *Id*. The other two OSRs were male and the three ISRs were female (Id. at p. 160).

During his deposition, Ron Porter testified that he believed women were effective OSRs and had been in the past (Doc. 52-3, p. 57). Sales representatives are expected to help the drivers with deliveries, and in his opinion, women had the ability to make men unload the delivery trucks and also had the ability to make sales (Doc. 52-3, pp. 55-56). Porter had no hesitations about hiring a female for the position:

> Q: Did you have any impressions or hesitations towards having a female staff member being on the road alone?
> A: No.
> Q: No hesitations about their safety?
> A: Well, I've always got a fear about somebody's safety.
> Q: But because they're female?
> A: I just think that's in our genetics.
> Q: Genetics?
> A: Yes. We're supposed to be the protector of the female gender. We are the male.
> Q: So you feel that the men of the world are supposed to protect the women?
> A: I think the Lord believed that, yes.
> Q: Have you sent female sales staff on the road alone before?
> A: Yes.

(Doc. 52-3, p. 57).

During her deposition, Swyear testified that between June 22, 2015 and July 14, 2015, there were several instances when she felt uncomfortable at work (Doc. 46-1, p. 77). She noted that her male and female co-workers referred to certain men and a woman by nicknames she found offensive (Doc. 46-1, p. 85). For example, she was introduced to one male truck driver known as "Bitchy Ritchie" and another male driver who was called "Nipps." *Id*. One female concessionaire who ran a concession named "Conti's" was called "Cunty" by some of the male and female employees. *Id*. at p. 81. Swyear testified that Porter was present when some of these nicknames were used – although she could not tell if he was within earshot. *Id*. at p. 82.

There were discussions about what woman employee Russ Scott would be with during a particular week or who he would bring to the "party barn[1]." *Id*. at pp. 81-82. There were also jokes made about Scott's women not having any teeth. *Id*. At one point, Williams "put his finger in his ears and [said] I don't want to hear any of them" – as if to say he was "not participating in this." *Id*. at p. 83.

Swyear and her coworkers talked about one young employee who they all believed dressed inappropriately. Swyear saw Porter present when these discussions were taking place around four to six times. *Id*. at p. 86.

---

[1] The "party barn" is a building near the Fare Foods' office which was built for Porter's parents to reside in when vacationing. It is essentially a pole barn which was converted into a fully equipped two bedroom apartment with a large space to park a recreational vehicle. It was offered to employees as a place to stay in lieu of a motel when they returned late in the evening from sales calls or deliveries and they were not within a short traveling distance back home. The "party barn" was named by Ron and Laura Porter's daughter when she was six or seven years of age and the name stuck. Swyear testified that she never personally experienced or observed any allegedly offensive behavior in the "party barn" (Doc. 46-1, p. 171).

Swyear did not tell anyone that the nicknames or jokes offended her, nor did she make any formal or informal complaints. *Id*. at pp. 86-87. Regarding her co-workers' behavior, Swyear told Williams that the behavior "wasn't in a sexual connotation" but was aggressive, disrespectful, and rude. *Id*. at p. 87. She also told Williams that she thought her co-workers were disrespectful to him: "I did say I can't believe these people talk to you that way. That was – just more hostile – I mean they weren't all in a sexual nature, but there was a lot of rough talk" and disrespect. *Id*. at p. 88.

On July 15, 2015, Swyear and Russ Scott met at a fair in or near East Moline so that Scott could introduce her to customers. *Id*. at p. 91. Prior to their meeting, Swyear knew Scott's name, but had never met him. *Id*. Following their visit with customers, both Swyear and Scott checked in to the Lodge Hotel in Bentonville, Iowa (Doc. 22, ¶ 37).

After checking in and inspecting their respective rooms (which were located next to each other), Scott followed Swyear into her room on the pretense of checking the air conditioner because the room was warm. *Id*. at p. 107. This made Swyear uncomfortable, so she ushered Scott to the hotel restaurant for dinner. *Id*. At dinner, Swyear found it offensive that Scott pulled out her chair for her and she did not want him to think they were on a date. *Id*. at p. 112. She also felt uncomfortable when Scott told her several times that he was single. *Id*. Scott had three beers during dinner. *Id*. at pp. 111-112.

After dinner, Swyear and Scott took a tour of the hotel. *Id*. at p. 115. While passing the swimming pool, Scott asked her if she wanted to go swimming – implying that they could go skinny dipping. *Id*. at p. 116. She declined his offer. *Id*. On the way back to their rooms, Scott touched her back which made her uncomfortable. *Id*. at p. 117. Swyear testified that "generally,

it was more of a gentlemanly way, but considering everything else that he was doing, it made her uncomfortable." *Id*.

When they returned to their rooms, Scott told Swyear that "he love[d] to watch movies and cuddle." *Id*. at p. 118. He "suggested that we sleep together and watch a movie and take the blankets." *Id*. at p. 119. She told him that she was tired and was just going to bed. *Id*. Scott left the room but later knocked on her door several more times. *Id*. at pp. 120-121. She did not answer. *Id*. Scott then attempted to call Swyear. *Id*. Again, she did not answer. *Id*. Scott's actions made Swyear feel uncomfortable. The next morning, Scott called Swyear to let her know he had already left and was on the road. *Id* at p. 121. He stated that he had knocked on the door and called her because he wanted to go to Wal-Mart and felt he was too intoxicated to drive himself. *Id*. at p. 122.

On July 23, 2015, Swyear met with Scott Harsy, Fare Foods Administrative Supervisor, and Williams to discuss her performance (Doc. 52-2, p. 83, Doc. 46-2). At that meeting, Swyear was given specific directions as to how to improve her work, including making contact with customers and providing daily reports or texts regarding what she did and what customers she made contact with during each trip (Doc. 52-2, p. 180, Doc. 46-2). Williams also stressed that she needed to ask questions if she was unclear on something or needed clarification on a directive. Swyear was also told that she needed to stop being late to work (Doc. 52-2, p. 83, p. 180).

Approximately 30 minutes after the performance meeting, Swyear reported the July 15, 2015 incident with Scott to Harsy. She told Harsy that she thought somebody should know what happened. *Id*. at p. 127. Harsy told her that she absolutely should have reported the incident and that it needed to be documented. Id. Swyear believed that Harsy's response was appropriate. *Id*.

Harsy documented Swyear's verbal complaint. Swyear reported that Scott's comments made her feel very uncomfortable (Doc. 46-4). She also told Harsy that while she felt like she was in control of the situation, she thought she should report it. *Id.*

Harsy conducted an investigation regarding Swyear's allegations. He called Scott either that day or the next to discuss Swyear's allegations (Doc. 52-2, pp. 114-115). Scott confirmed most of the details, including asking Swyear to be cuddle buddies. *Id*. at pp. 132-133. Following the call with Scott, Harsy met with Porter and Williams to discuss the allegations. *Id*. at p. 122. Porter and Harsy mutually agreed that no discipline was warranted (Doc. 52-3, p. 82; 52-2, p. 180. Harsy did, however, ensure that Swyear and Scott did not work together in any capacity again. (Doc. 46-1, p. 206). There were no acts of sexual harassment directed against Swyear by anyone at Fare Foods other than the July 15, 2015 incident with Scott. *Id.*

Before reporting the incident, Swyear spent half the week in the office and half of the week on the road. *Id*. at p. 162. However, between July 23, 2015 and her termination on August 6, 2015, she spent most of the week working in the office. *Id.*[2] During this two week period, Swyear trained on the computer system and was also shown more things that the ISRs performed. She wanted to travel and asked Williams if she could travel, but it did not happen. *Id*. at p. 190. Williams told her that he needed to discuss her travel schedule with Porter and never provided any follow-up. *Id*. at pp. 191-193. Her salary did not change and no one ever told her that she was not going back on the road. She still had all of her OSR benefits such as her lodging card, gas card, credit card, and laptop, and continued to receive partial reimbursement for her cell phone. *Id*. at 193.

---

[2] She went on the road on at least two occasions during this period, June 27, 2015, and July 30, 2015 (Doc. 52-11).

On August 3, 2015, Williams and Harsy had another meeting with Swyear (Doc. 52-2, pp. 150-151). They discussed that Swyear needed to arrive to work on time, that she should only use the van for business purposes, and other performance issues (Doc. 52-2, p. 179, Doc. 52-11, Doc. 52-20). Williams put Swyear on a thirty (30) day performance improvement plan (Doc. 52-20).

Following the meeting, Swyear got in the company van and drove home (Doc. 52-11). She was called and asked to bring the van back. *Id*. When she returned the van, Harsy asked her to provide a written complaint regarding the July 15, 2015 incident by the end of the next day. (Doc. 46-1, pp. 160-161). Swyear did not provide the written statement on August 4, 2015 as requested. *Id*.

Porter testified that Williams called him to discuss the various meetings that Harsy and Williams had with Swyear regarding her performance and her failure to follow directions (Doc. 52-3, pp. 107-108). On August 5, 2015, Swyear developed an eye infection and called in sick on that day and the next. On August 6, 2015, Swyear received a telephone call from Williams who told her that it just was not working out (Doc. 46-1, p. 138).

Swyear testified that she thought something was off from the beginning of her employment. *Id*. at p. 157. She also testified that there was a lot of miscommunication about her job expectations. *Id*. at p. 148. For example, she did not think it was a problem that she was late to work until she was informed during a performance meeting (*Id*. at p. 148); she did not think that using the van to go to and from home was considered personal use until she was informed (Doc. 52-11). She would be scolded because she was not doing her job in a way that one particular person would want it done…there was "micromanaging to the extreme" (Doc. 46-1, p. 184).

**Discussion**

Swyear moves for summary judgment, asserting that Fare Foods openly discriminated against females, openly encouraged or condoned sexual harassment towards women, and retaliated against her for objecting to unwanted sexual advances. Fare Foods also moves for summary judgment, contending that Swyear cannot establish that the alleged sexual harassment was severe, pervasive or based on her gender. Fare Foods further contends that summary judgment is warranted on Swyear's retaliation claim because she did not engage in protected activity.

Summary judgment is proper only if the moving party can demonstrate there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); s*ee also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). Any doubt as to the existence of a genuine issue must be resolved against the moving party. *Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004). Cross-motions for summary judgment do not automatically mean that all questions of material fact have been resolved. *Franklin v. City of Evanston,* 384 F.3d 838, 842 (7th Cir. 2004). Rather, the Court must evaluate each motion independently, making all reasonable inferences in favor of the nonmoving party with respect to each motion. *Id.* at 483.

**Sexual Harassment**

Title VII prohibits employers from discriminating against any individual because of the individual's sex. 42 U.S.C. § 2000e-2(a)(1). "[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). To avoid summary judgment, a plaintiff must provide sufficient evidence to create a genuine issue of material fact as to four

elements: (1) the plaintiff was subjected to unwelcome harassment; (2) the harassment was based on her sex; (3) the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007).

"The critical issue is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (internal citation and quotation marks omitted). An inference of discrimination may be supported by various types of evidence, including evidence of implicit or explicit proposals of sexual activity by the harasser to the victim, evidence suggesting the harasser's general hostility to the presence of one gender in the workplace, or comparative evidence about the harasser's disparate treatment of members of both sexes. *Oncale*, 523 U.S at 80-81.

The third prong of the test, which requires the conduct to be severe or pervasive, has both an objective and a subjective component. *See Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008). "The plaintiff may satisfy the subjective prong by presenting evidence that [s]he in fact perceived [her] workplace as hostile or abusive." *Id.* The objective requirement, however, requires the Court to look at the totality of the circumstances. *Id.* "Deciding whether a work environment is hostile requires consideration of factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016) (citing *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)).

One extremely serious act of harassment could rise to an actionable level, as could a series of less severe acts. *See Haugerud v. Amery School Dist.,* 259 F.3d 678, 693 (7th Cir. 2001). It is difficult to establish exactly where the line gets drawn, but it has been long established that the "concept of sexual harassment is designed to protect women from the kind of male attentions that can make the workplace hellish for women....It is not designed to purge the workplace of vulgarity." *Baskerville v. Culligan International Co.,* 50 F.3d 428, 430 (7th Cir. 1995). For example, in *Baskerville,* the Seventh Circuit held that calling the plaintiff "pretty girl"; grunting when she wore a leather skirt; suggesting she heated up his office; telling her that a P.A. system "attention" announcement meant that "All pretty girls run around naked"; implying that "pretty girls" at the office might make him "lose control"; insinuating that she and he had been "dancing, like in a night club"; and mentioning that it was lonely in his hotel and stating, with a gesture suggesting masturbation, that all he had for company was a pillow was not actionable sexual harassment. *Baskerville,* 50 F.3d at 430.

Swyear argues that Scott's unwanted sexual advances constitute unlawful sexual harassment. However, Fare Foods maintains that, even assuming the July 15, 2015 incident occurred as Swyear describes, the conduct was not severe are pervasive, nor did it alter the conditions of her employment. According to Swyear, Scott made several unwanted sexual advances to her at the hotel including: rubbing her back and standing too close before dinner, asking her if she wanted to go swimming, and asking her if they could be cuddle buddies. After that night, Swyear never saw or worked with Scott again.

Although Scott's behavior was inappropriate and tinged with sexual innuendo, it does not rise to the level of actionable sexual harassment. *See McPherson v. City of Waukegan*, 379 F.3d 430, 434, 439 (7th Cir. 2004) (allegation that supervisor pulled back the plaintiff's shirt to see her

bra" did not constitute sufficiently severe conduct); *Hilt–Dyson v. City of Chicago*, 282 F.3d 456, 463–64 (7th Cir .2002) (supervisor rubbing the plaintiff's back did not rise to the level of actionable sexual harassment). Scott left Swyear's room after she declined his offer to cuddle. He did not physically assault Swyear nor did he threaten her. *See, e.g.*, *Hostetler,* 218 F.3d at 809 (fellow employee not only forcibly kissed plaintiff but later cornered plaintiff and attempted to remove her brassiere); *Smith v. Sheahan,* 189 F.3d 529, 532 (7th Cir. 1999) (fellow employee physically assaulted plaintiff and had history of verbally abusing female co-workers). Scott's behavior made Swyear uncomfortable, but she always felt in control of the situation.

Additionally, there is no evidence that the isolated incident with Scott altered the conditions of Swyear's employment or created a hostile or abusive atmosphere. Thus, the evidence in the record regarding the isolated incident with Scott is insufficient to support a sexual harassment claim.

There is also no basis for employer liability in this case. The standard for imputing liability for workplace harassment to an employer depends on whether the harasser is a supervisor. If the harasser is a supervisor, then the employer is strictly liable for the harassment, unless it can establish that it did not take any tangible employment action against the plaintiff, it took reasonable care to prevent or correct harassment, and the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013). If the alleged harasser is a mere co-worker, the employer is only liable if it was negligent in controlling working conditions. *Id.*

Scott was not Swyear's supervisor for Title VII purposes. Therefore, Fare Foods is only liable for his actions if it was negligent in either discovering or remedying the harassment. *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 898 (7th Cir. 2016). More specifically, to avoid

liability for workplace harassment, an employer must take "prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring" upon receiving notice of the harassment. *Cole*, 838 F.3d at 898.

Here, Swyear did not tell Fare Foods that Scott made her uncomfortable until approximately one week after the incident. After she disclosed the incident to Harsy, he investigated and Swyear and Scott never worked together again. The incident with Scott was a one-time event. "There is no question that a stoppage of harassment shows [the] effectiveness" of an employer's corrective action. *Porter*, 576 F.3d at 637.

Swyear suggests that Fare Foods should have disciplined Scott, but "[w]hatever reasons there might be for the company's failure to take additional steps ... are irrelevant absent evidence suggesting that the [action the company took] was not reasonably likely to prevent the harassment from recurring." *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 536 (7th Cir. 1993). In this case, the cessation of the alleged harassment is indicative of the effectiveness of the corrective action.

Swyear also claims that Fare Foods fostered a hostile work environment where employees utilized derogatory terms such as "Cunty," "Nips", and "Bitchy Ritchie" to describe customers and fellow employees and discussed sexual exploits. But these comments do not constitute sexual harassment, nor did they create a hostile work environment. All of the comments Swyear complains of were made to or about other employees and overheard by Swyear. No inappropriate comments were ever directed at her. As the Seventh Circuit has noted, "[t]he American workplace would be a seething cauldron if workers could with impunity pepper their employer and eventually the EEOC and the courts with complaints of being offended by remarks and behaviors unrelated to the complainant except for his having overheard,

liability for workplace harassment, an employer must take "prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring" upon receiving notice of the harassment. *Cole*, 838 F.3d at 898.

Here, Swyear did not tell Fare Foods that Scott made her uncomfortable until approximately one week after the incident. After she disclosed the incident to Harsy, he investigated and Swyear and Scott never worked together again. The incident with Scott was a one-time event. "There is no question that a stoppage of harassment shows [the] effectiveness" of an employer's corrective action. *Porter*, 576 F.3d at 637.

Swyear suggests that Fare Foods should have disciplined Scott, but "[w]hatever reasons there might be for the company's failure to take additional steps ... are irrelevant absent evidence suggesting that the [action the company took] was not reasonably likely to prevent the harassment from recurring." *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 536 (7th Cir. 1993). In this case, the cessation of the alleged harassment is indicative of the effectiveness of the corrective action.

Swyear also claims that Fare Foods fostered a hostile work environment where employees utilized derogatory terms such as "Cunty," "Nips", and "Bitchy Ritchie" to describe customers and fellow employees and discussed sexual exploits. But these comments do not constitute sexual harassment, nor did they create a hostile work environment. All of the comments Swyear complains of were made to or about other employees and overheard by Swyear. No inappropriate comments were ever directed at her. As the Seventh Circuit has noted, "[t]he American workplace would be a seething cauldron if workers could with impunity pepper their employer and eventually the EEOC and the courts with complaints of being offended by remarks and behaviors unrelated to the complainant except for his having overheard,

Page **12** of **18**

or heard of, them." *Hildebrandt v. Illinois Dept. of Natural Resources*, 347 F.3d 1014, 1035 (7th Cir. 2003).

Moreover, while the Court finds nicknames such as "Bitchy Ritchie" and "Cunty" uncouth and inappropriate, certainly in the workplace, their usage did not demonstrate hostility toward women specifically, and were apparently utilized by both the men and women in the office. Sexual harassment must be based on the plaintiff's gender – not be merely gender-related. *Galloway v. G.M. Serv. Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996). Swyear has also failed to produce any evidence suggesting these comments interfered with her work environment. Even if Swyear's co-workers comments had created a hostile work environment, Fare Foods could not be held liable unless it was aware of the situation and failed to take corrective action. *Doe v. RR Donnelley & Sons, Co.*, 42 F.3d 439, 446 (7th Cir. 1994). Here, Swyear admits she never told her co-workers or Human Resources that she was offended by these nicknames or discussions.

Finally, Swyear contends that Fare Foods created "gender hurdles" due to Porter's alleged belief that women are "basically potential victims requiring protection due to genetic inferiority" – citing to a portion of Porter's deposition testimony. But a review of that testimony shows that Swyear's portrayal is inaccurate:

> Q: Did you have any impressions or hesitations towards having a female staff member being on the road alone?
> A: No.
> Q: No hesitations about their safety?
> A: Well, I've always got a fear about somebody's safety.
> Q: But because they're female?
> A: I just think that's in our genetics.
> Q: Genetics?
> A: Yes. We're supposed to be the protector of the female gender. We are the male.
> Q: So you feel that the men of the world are supposed to protect the women?
> A: I think the Lord believed that, yes.

> Q: Have you sent female sales staff on the road alone before?
> A: Yes.

(Doc. 52-3, p. 57).

Swyear also maintains the "gender hurdles" in her employment included Fare Foods refusal to give her the same schedule, tools, and discretion to use her own professional judgment that the other male OSRs maintained. Other than Swyear's suppositions, however, there is no evidence that Fare Foods created any so-called "gender hurdles." Fare Foods had hired other female OSRs in the past. Regarding her work schedule, Swyear conceded that new OSRs spent more time working in the office while they received training and that all new OSRs trained with ISRs because the ISRs were well-versed on the computer system utilized by Fare Foods. Swyear also testified that she received the same benefits that the other OSRs had, including a lodging card, gas card, and laptop. She also received partial reimbursement for her cell phone. Again, there is no evidence that Swyear ever complained about "gender hurdles" to anyone at Fare Foods, nor do the alleged "gender hurdles" constitute sexual harassment. Even viewing the evidence in the light most favorable to Swyear, Fare Foods is entitled to summary judgment on her sexual harassment claim.

**Sexual Discrimination**

To succeed on her sexual discrimination claim, Swyear must establish that: (1) she is a member of a protected class; (2) she was meeting Fare Foods' legitimate performance expectations; (3) she suffered an adverse employment action; and (4) another similarly situated individual not in the protected class was treated more favorably than she was. *See Coleman v. Donahoe*, 667 F.3d 835, 835 (7th Cir. 2012).

While the first and third elements are undisputed, Swyear has presented no evidence to establish that her job performance met Fare Foods' expectations. She merely testified that she

found her own performance acceptable. On the other hand, the evidence establishes that Swyear participated in performance meetings to discuss how she could improve her work, including making contact with customers and providing daily reports or texts regarding what she did and what customers she made contact with during each trip. Williams counseled Swyear that she needed to ask questions if she was unclear on something or needed clarification on a directive. Swyear was also told on more than one occasion that she needed to come to work on time. Following the August 3, 2015, performance meeting, Swyear admitted to utilizing the company van to go home after being told that it was only for business purposes. Swyear does not deny that these performance meetings occurred.

As to the fourth element, there is no evidence that any similarly situated male employee was treated differently. "In order for an individual to be similarly situated to the plaintiff, the plaintiff must show that the individual is directly comparable to her in all material respects." *Burks v. Wis. Dept. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (citing *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). In general, a Title VII plaintiff must show that her comparators "dealt with the same supervisor, were subject to the same standards and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008) (internal quotation marks and citations omitted). The similarly situated inquiry "is a flexible, common-sense one that asks, at bottom, whether there are enough common factors ... to allow for a meaningful comparison in order to divine whether intentional discrimination was at play." *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007).

Swyear testified that she received the same benefits as the other OSRs, including a lodging card, gas card, a laptop, and partial reimbursement for her cell phone. While she claims

that she did not receive a corporate credit card as quickly as some male employees, there is no evidence that any OSR received a corporate credit card within any particular timeframe. Instead, Swyear points to Williams and Harsy – neither OSRs, but both members of the management team – as examples of employees who received corporate cards within two weeks instead of the eight weeks that Swyear was told she would have to wait.[3] On these facts, Swyear's sexual discrimination claim does not survive summary judgment.[4]

## Retaliation

Title VII forbids an employer from discriminating against an employee who has "opposed any practice" made unlawful by Title VII or who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e–3(a). The critical question is "…whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also David v. Board of Trustees of Community College Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

A plaintiff may prove retaliation by showing that, in addition to engaging in a statutorily protected activity and suffering a materially adverse employment action, she was "meeting [her] employer's legitimate expectations; and ... [she] was treated less favorably than similarly-situated employees who did not engage in protected activity." *Boss*, 816 F.3d at 918. If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to present a legitimate, non-retaliatory reason for the adverse employment action. *Haywood v. Lucent Technologies,*

---

[3] Swyear further testified that she did receive a credit card at some point during her six weeks at Fare Foods.

[4] Although Swyear moved for summary judgment on her sexual discrimination claim in the introduction paragraph of her motion, other than the introduction, there is no discussion or argument supporting this claim in the reminder of her briefing.

*Inc.*, 323 F.3d 524, 531 (7th Cir. 2003). Once the defendant presents a legitimate non-invidious reason, the burden shifts back to the plaintiff to show that the defendant's reason is pretextual. *Silverman,* 637 F.3d at 742.

Swyear asserts that telling Harsy about the July 15, 2015, incident constitutes protected activity. Approximately 30-minutes following a performance review meeting between Williams, Harsy, and Swyear, she returned to Harsy's office to tell him about the incident. She informed him that Scott made her feel uncomfortable and that she thought he should know about the incident. Swyear was terminated approximately two weeks later; timing she argues is suspicious. Fare Foods maintains that Swyear was terminated due to performance reasons and that she just was not working out – she was late for work, used the company van for personal use even after being told that van was for business use only, was ticketed for being on her cell phone while driving the company van, and failed to follow directives.

Evidence of suspicious timing is generally insufficient to permit a plaintiff to survive summary judgment on the issue of causation unless it "follows on the close heels of protected expression." *Lord,* 839 F.3d at 564. An interval of several weeks or months may provide probative evidence of the required causal nexus. However, such a long interval will likely only suffice to defeat summary judgment if there is other evidence corroborating retaliatory motive. *Coleman,* 667 F.3d at 861.

Here, other than Swyear's testimony, there is no evidence that she was meeting Fare Foods' legitimate expectations. Significantly, her first performance meeting occurred prior to her disclosing the events of July 15, 2015. While Swyear contends that her mistakes were due to miscommunication and too many people micromanaging her, and that she believed it was okay to be late and to drive the van home because she did not consider her commute to and from work

as personal usage, there is no evidence that "calls ... into question" the reasons Fare Foods gave for Swyear's termination. *Lord*, 839 F.3d at 564. "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer, it is a lie, specifically, a phony reasons for some action." *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008). An employer's reasons for firing an employee can be "foolish or trivial or even baseless," as long as they are "honestly believed." *Lord,* 839 F.3d at 564.

As in *Lord*, rather than "casting doubt on the sincerity" of defendant's reasons for firing her, Swyear "merely quibbles with the wisdom of [her] employer's decision." *Id.* But courts do not second-guess such personnel management decisions. Rather, "[f]ederal courts intervene in these sorts of personnel disputes 'only where an employer's reason for [an adverse action] is without factual basis or is completely unreasonable." *Nicholson v. City of Peoria, Ill.*, 860 F.3d 520, 524 (7th Cir. 2017). As a matter of law, Fare Foods' stated reasons for terminating Swyear are neither unreasonable nor pretextual. Accordingly, it is entitled to summary judgment on Swyear's retaliation claim.

## Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion for Summary Judgment is **DENIED**. The Clerk of Court is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED: April 27, 2018**

s/ Staci M. Yandle
**STACI M. YANDLE**
**United States District Judge**